744 A.2d 113

GALE ANN LYNCH AND ROBERT LOUIS LYNCH, HER HUS-BAND, AND JOSEPH LYNCH, AN INFANT, BY HIS GUARD-IANS AD LITEM, GALE ANN LYNCH AND ROBERT LOUIS LYNCH, AND GALE ANN LYNCH AND ROBERT LOUIS LYNCH, INDIVIDUALLY AND PER QUOD, PLAINTIFFS–RE-SPONDENTS, v. LAURENCE M. SCHEININGER, M.D., DE-FENDANT–APPELLANT, AND ESTATE OF JERROLD S. FINKEL, M.D., PAUL DRUCKER, M.D., LAWRENCE A. SEITZ-MAN, M.D., DRS. FINKEL, DRUCKER & SEITZMAN, PRO-FESSIONAL ASSOCIATION, DRUCKERS, SEITZMAN & SCHEININGER PROFESSIONAL ASSOCIATION, EITHER A CORPORATION, PARTNERSHIP, INDIVIDUAL PROPRIETOR-SHIP, JOHN F. KENNEDY MEDICAL CENTER, AND STE-PHEN A. GROCHMAL, M.D., DEFENDANTS.

Argued September 13, 1999—Decided January 25, 2000.

212

*Hugh P Francis,* argued the cause for appellant (*Francis & O'Farrell,* attorneys; *Mr. Francis* and *John O'Farrell* of counsel; *Beth A. Hardy,* on the briefs).

*Richard C. Swarbrick,* argued the cause for respondents.

The opinion of the Court was delivered by

STEIN, J.

This appeal presents an issue of first impression concerning recognition of and limitations on a physician's liability for a preconception tort allegedly resulting in harm to a child conceived after the negligence occurred. The questions that primarily will determine our resolution of this appeal are first, whether the parents' voluntary act of conception, although aware of an increased risk of harm to a child born of the pregnancy, is a superseding cause that relieves the physician of liability, and second, whether communication of an adequate warning of the increased risk of harm by the negligent physician or by others limits the physician's liability.

Reversing the Law Division and remanding the matter for a new trial on the infant's malpractice claim, the Appellate Division in a published opinion, *Lynch v. Scheininger,* 314 *N.J.Super.* 318, 714 *A.*2d 970 (App.Div.1998), held that the parent's "voluntary decision to conceive another child did not constitute a supervening cause" that precluded the child from maintaining a malpractice claim to recover damages for devastating and irremediable birth defects allegedly caused in part by the preconception negligence of the mother's physician during a prior pregnancy. *Id.* at 329, 714 *A.*2d 970. In that court's view, the evidence of the extent of the parents' knowledge of the risk of harm to children of subsequent pregnancies was "sharply conflicting." Accordingly, the Appellate Division did not decide whether voluntary conception coupled with knowledge that a child of a subsequent pregnancy was highly likely to be born with serious disabilities would insulate the physician from liability. *Id.* at 330–31, 714 *A.*2d 970.

## I

This medical malpractice action against defendants Laurence M. Scheininger and Lawrence A. Seitzman, arises out of obstetrical services rendered by them to plaintiff Gale Lynch during a 1984 pregnancy that terminated in a stillbirth. (Other named defendants either were not served or were dismissed from the litigation before the jury verdict.) The uncontradicted medical evidence at trial established that the 1984 stillbirth was attributed to erythroblastosis fetalis, a condition of the fetus caused by the incompatibility of maternal and fetal blood Rh factors. The record indicates that Mrs. Lynch's blood is Rh negative and that the blood of the baby she carried to term in 1984 was Rh positive. According to the medical testimony, when a mother's Rh negative blood is exposed to the Rh positive blood of her fetus the mother's immune system reacts as if the fetal blood were a foreign substance, producing antibodies to attack the fetal blood cells. That process, called Rh isoimmunization, can be prevented by a drug called Rhogam if it is administered before antibodies are produced and

isoimmunization occurs. Once it occurs, however, isoimmunization is irreversible. Erythroblastosis fetalis, the condition resulting from the effects of the mother's Rh isoimmunization on the fetus, occurs when the mother's and fetus' blood combine causing the mother's antibodies to destroy red blood cells of the fetus. The fetus' attempt to compensate for destruction of its red blood cells by overproducing more blood cells can lead to organ failure or eventual death if the fetus is not given blood transfusions or delivered prematurely.

Mrs. Lynch had delivered two healthy children during a prior marriage. When she became pregnant in 1984 her obstetrician was Dr. Jerrold Finkel, who died during that pregnancy. Dr. Scheininger, who practiced with Dr. Finkel, assumed responsibility for her care. Dr. Scheininger has acknowledged that he did not diagnose Mrs. Lynch's Rh isoimmunization during the 1984 pregnancy, and that his failure to treat her for that condition was a factor that resulted in the stillbirth of an infant boy named Brian.

In 1986 Mrs. Lynch and her husband Robert instituted a malpractice suit against Dr. Scheininger and others to recover damages relating to the stillbirth. While that action was pending, Mrs. Lynch gave birth to plaintiff Joseph Lynch on January 11, 1987. Tragically, Joseph was born with significant and permanent neurological disabilities, and the evidence is undisputed that those disabilities were caused by erythroblastosis fetalis, the condition that led to the 1984 stillbirth. In January 1990, plaintiffs moved to amend their complaint in the suit arising out of the stillbirth to assert damage claims relating to Joseph's birth. When that motion was denied, plaintiffs instituted this action against Drs. Scheininger, Seitzman, and others, alleging that defendants' failure to diagnose and treat Mrs. Lynch's Rh isoimmunization during her 1984 pregnancy resulted in an intensification of that isoimmunization that increased the risk of harm to children subsequently conceived. In the second suit plaintiffs asserted a claim of wrongful birth on their own behalf, see *Procanik v. Cillo*, 97 *N.J.* 339, 348, 478 *A.*2d 755 (1984), a claim of "wrongful life" on

Joseph's behalf based on defendants' alleged failure to inform them of the risks of a future pregnancy, see *ibid.,* and a claim on Joseph's behalf alleging that defendants' malpractice during the 1984 pregnancy was a substantial contributing cause of Joseph's severe impairments and resultant medical and other expenses.

In 1992, while this action was pending, the earlier suit against Dr. Scheininger seeking damages arising from the 1984 stillbirth was settled, but the release executed by plaintiffs in connection with that settlement expressly excluded the claims asserted against Dr. Scheininger in the present action. During the course of this action plaintiffs also settled their claims against Dr. Stephen Grochmal, the treating doctor during Mrs. Lynch's pregnancy with Joseph, who was joined as a defendant after Dr. Scheininger filed a third-party complaint against him.

During the course of trial, the Law Division conducted a *Lopez* hearing, see *Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.2d* 563 (1973), in response to defendants' contention that the wrongful birth claim asserted by Mr. and Mrs. Lynch was barred by the two-year statute of limitations because this suit was not instituted until January 23, 1990, more than two years after Joseph's birth on January 11, 1987. The Lynches relied on the "discovery rule" articulated in *Lopez, id.* at 272, 300 *A.2d* 563, contending that they were unaware of the connection between defendants' 1984 negligence and Joseph's neurological impairments until October 1989, when they received the report of their expert, Dr. Stefan Semchyshyn. At the conclusion of the *Lopez* hearing the trial court determined that plaintiffs knew or should have known at the time of Joseph's birth of their potential claim against defendants for Joseph's injuries, and consequently dismissed the Lynches' wrongful birth claim. The trial court also dismissed Joseph's wrongful life claim at the close of plaintiffs' case, concluding that the evidence adduced at trial could not support a jury finding that the Lynches relied on defendants' advice in deciding to conceive another child.

Our careful review of the record reveals that the trial of this matter was unusually contentious, in large part because of the belligerent and unruly tactics of plaintiffs' counsel.[1] Two significant factual issues were sharply contested. The first concerned whether defendants' alleged malpractice during the 1984 pregnancy was a proximate cause of Joseph's disabilities. Plaintiffs' expert, Dr. Semchyshyn, testified that defendants' failure properly to treat Mrs. Lynch's Rh isoimmunization by transfusion and early delivery of the fetus had the effect of increasing the extent of her isoimmunization with resultant detrimental effects on Joseph during the 1987 pregnancy.

Dr. Anthony Quartell, defendants' expert, testified that although Mrs. Lynch's isoimmunization increased during the course of the 1984 pregnancy, the only noteworthy increase occurred when the placenta pulled away from the mother during delivery causing a significant flow of the baby's blood into the mother. According to Dr. Quartell, that process would have occurred no matter how the 1984 pregnancy terminated and was not significantly influenced by defendants' treatment of Mrs. Lynch. His opinion was that defendants' deviations in 1984 caused harm to the infant born of that pregnancy, but did not contribute to Joseph's disabilities. He expressed the view that Mrs. Lynch's miscarriage in 1985 also increased her isoimmunization, an assertion that was disputed by Dr. Semchyshyn.

Significantly, Dr. Quartell expressed the opinion that, notwithstanding Mrs. Lynch's increased isoimmunization, appropriate management of the 1987 pregnancy could have avoided the harm to Joseph. According to Dr. Quartell, appropriate management of that pregnancy would have required periodic measurement of the Rh antibody concentration in Mrs. Lynch's blood, periodic withdrawal of fluid from the amniotic cavity to measure the extent of

---

[1] Concurrently with the filing of this opinion, we are requesting the Office of Attorney Ethics to review the transcript of the trial to ascertain whether the conduct of plaintiffs' counsel may have violated provisions of the Rules of Professional Conduct. See RPC 3:5(c).

bilirubin in the amniotic fluid in order to determine the extent of the damage to the fetus' red blood cells, administration of intra-uterine transfusions to the fetus, and early delivery of the fetus to diminish the harm to the fetus' red blood cells caused by the mother's isoimmunization.

The second issue that was sharply contested at trial concerned when the Lynches acquired knowledge that Mrs. Lynch's Rh isoimmunization posed a danger to the health of children born as a result of pregnancies subsequent to the 1984 stillbirth. Mrs. Lynch maintained that she first acquired that knowledge in October 1989 when she received and read the report of her expert, Dr. Semchyshyn. She testified at trial that after the 1984 stillbirth Dr. Seitzman visited her at the hospital and told her that she should not conceive another baby "at this time," which she understood to mean that she should allow time to heal and recuperate from the 1984 stillbirth before conceiving another child. She acknowledged that shortly after the stillbirth she consulted with a Philadelphia physician specializing in high-risk pregnancies, and subsequently consulted with Doctors Harrigan, Grochmal, and Choppe at the St. Peter's Neonatal Clinic. While under the care of those doctors she became pregnant in 1985, but miscarried after a few weeks. She testified that none of the doctors at the St. Peter's clinic discussed erythroblastosis fetalis or cautioned her against future pregnancies. The uncontested trial testimony revealed that Dr. Grochmal, who left the St. Peter's clinic to establish his own practice and cared for Mrs. Lynch during her 1987 pregnancy with Joseph, also failed to recognize and treat her Rh isoimmunization during that pregnancy.

Defendants contended that the Lynches were aware of a possible connection between the 1984 pregnancy and the 1987 pregnancy long before receiving Dr. Semchyshyn's report in October 1989. Defendants primarily relied on the autopsy report of the 1984 stillbirth that recorded the cause of death as erythroblastosis fetalis, plaintiffs' subsequent consultations with specialists in high-risk pregnancies, a newspaper article published in April 1987 that

described Joseph's disabilities and their medical cause, and statements allegedly made by Dr. Grochmal before Joseph's birth criticizing defendants for failing to prescribe Rhogam for Mrs. Lynch. As noted, *supra* at 216, 744 *A*.2d at 117, at the conclusion of the *Lopez* hearing the trial court, on the basis of defendants' contentions, concluded that the Lynches' wrongful birth action accrued on January 11, 1987 when Joseph was born, and accordingly was barred by the two-year statute of limitations.

After a twenty-three day trial, the trial court submitted the case to the jury, reserving decision on defendants' motions to dismiss Joseph's malpractice claims. The jury, however, was unable to reach a verdict.

In an unpublished opinion on the reserved motions, the trial court presumed that New Jersey courts would recognize a cause of action for a "preconception tort," characterized as a claim that a doctor's negligence caused damage to a woman's reproductive system resulting in harm to a child conceived after the negligence occurred. However, the trial court asserted that the *Lopez* hearing had resulted in a finding that "plaintiffs were aware of the risks presented by Mrs. Lynch's Rh negative condition prior to [Joseph's] conception." (We note our disagreement with the trial court's characterization of its own finding at the *Lopez* hearing. As we read the record, at the conclusion of the *Lopez* hearing the trial court determined only that plaintiffs' wrongful birth cause of action accrued as of the date of Joseph's birth.) The trial court then determined that, based on collateral estoppel, its finding at the *Lopez* hearing constituted an adjudication on the merits of when plaintiffs knew that Mrs. Lynch's Rh condition posed a risk to future pregnancies. Based on that reasoning, the trial court held that plaintiffs' intentional conception of Joseph with knowledge of a risk presented by Mrs. Lynch's Rh negative blood constituted a supervening cause of Joseph's condition that barred imposition of liability on defendant Scheininger.

The Appellate Division affirmed the trial court's dismissal of the Lynches' wrongful birth claim on statute of limitations grounds.

That court also affirmed the dismissal of Joseph's "wrongful life" claim, as well as plaintiffs' claims against Dr. Seitzman because of a lack of proof of his malpractice. The Appellate Division reversed, however, the trial court's judgment dismissing Joseph's malpractice cause of action against Dr. Scheininger.

Preliminarily, although not disputing the trial court's characterization of its *Lopez* hearing finding as establishing that plaintiffs were aware of the risks presented by Mrs. Lynch's Rh negative condition *prior to Joseph's conception*, the Appellate Division concluded that that finding was not subject to collateral estoppel on the motion to dismiss Joseph's claims because it was not necessary to support the court's determination to dismiss the parents' wrongful birth claim. 314 *N.J.Super.* at 326–27 n. 6, 714 *A.*2d 970. As that court explained, the dismissal of that claim could be justified by the trial court's finding that the Lynches knew of the causal connection between Mrs. Lynch's Rh negative blood and Joseph's disabilities *at the time of Joseph's birth. Ibid.* For similar reasons the Appellate Division rejected the trial court's reliance on the law of the case doctrine, concluding that that doctrine was inapplicable because the factual and legal issues resolved at the *Lopez* hearing "were different from the issue presented by defendants' motion to dismiss plaintiffs' claim." *Ibid.* We agree with the Appellate Division's view on the collateral estoppel and law of the case issues although, as noted earlier, we are unable to conclude that the trial court found at the *Lopez* hearing that prior to Joseph's *conception* plaintiffs were aware of the risks posed by Mrs. Lynch's Rh negative blood.

Impliedly accepting the trial court's conclusion that New Jersey courts generally would recognize a claim for malpractice based on preconception negligence, the Appellate Division focused on whether, assuming the Lynches knew prior to Joseph's conception that Mrs. Lynch's Rh blood created a greater than normal risk for future pregnancies, that knowledge would bar Joseph's claims against Dr. Scheininger. The Appellate Division observed that it was "reasonably foreseeable that a married couple would attempt

to conceive additional children [notwithstanding the fact that] a doctor's malpractice in connection with a prior pregnancy has increased the risk that a child born of a subsequent pregnancy will suffer abnormalities." *Id.* at 328–29, 714 *A.*2d 970. Accordingly, that court concluded that the Lynches' "voluntary decision to conceive another child did not constitute a supervening cause of Joseph's disabilities," and therefore Joseph was not precluded from pursuing his malpractice action against Dr. Scheininger. *Id.* at 329, 714 *A.*2d 970. Because that court found "sharply conflicting" the evidence concerning what warnings were communicated to the Lynches about the risks of a future pregnancy, it declined to decide whether Dr. Scheininger would be insulated from liability if the Lynches knew prior to conceiving Joseph that there was a high likelihood that a child of a subsequent pregnancy would be born with serious disabilities. *Id.* at 330–31, 714 *A.*2d 970.

## II

### A

Although the issue is one of first impression in this Court, both lower courts—the Law Division expressly and the Appellate Division by implication—assumed that New Jersey courts would recognize an infant's cause of action for medical malpractice arising out of negligent conduct occurring prior to the infant's conception that proximately caused injury to the infant. In *Taylor v. Cutler,* 157 *N.J.* 525, 724 *A.*2d 793 (1999), we affirmed the Appellate Division's judgment dismissing a child's suit for damages allegedly caused by an automobile accident between defendant and the child's mother approximately seven years prior to the child's birth. In *Taylor,* we expressly declined to express any view concerning preconception torts in a medical malpractice context. *Id.* at 525, 724 *A.*2d 793.

A brief review of the law concerning recovery for prenatal torts in general, and preconception torts specifically, will illuminate the issue. Prior to 1946, decisions throughout the country uniformly denied recovery for claims asserted by a child alleging injury at

birth that was caused by negligently inflicted harm to the child's mother during pregnancy. W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 55 at 367 (5th ed. 1984) (*Prosser and Keeton*). The reasons generally advanced for denying recovery were, first, that the defendant owed no duty to a person not in existence when the negligence occurred; and second, because proof of causation in such circumstances was· imprecise, recognition of a cause of action would encourage the filing of spurious claims. *Ibid.*

Beginning with *Bonbrest v. Kotz*, 65 *F.Supp.* 138 (D.D.C.1946), a District of Columbia federal court decision, courts through the country abandoned the no-duty rule, and virtually all jurisdictions presently recognize a child's cause of action for the consequences of prenatal injuries. *Prosser and Keeton, supra*, at 368. This Court so held in *Smith v. Brennan*, 31 *N.J.* 353, 157 *A.2d* 497 (1960). Several commentators have thoroughly reviewed the development of the case law resulting in the abandonment of the no-duty rule in prenatal tort cases. See Elizabeth F. Collins, *An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death, and Wrongful Birth: Time for a New Framework*, 22 *J. Fam. L.* 677 (1983/84); Anastasia Enneking, *The Missouri Supreme Court Recognizes Preconception Tort Liability: Lough v. Rolla Women's Clinic, Inc.*, 63 *UMKC L.Rev.* 165 (1994); Horace B. Robertson, Jr., *Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life*, 1978 *Duke L.J.* 1401 (1978); Note, *Preconception Tort as a Basis for Recovery*, 60 *Wash. U. L.Q.*, 275 (1982).

The earliest reported cases recognizing a child's malpractice cause of action based on preconception negligence were decided in the 1970s. In *Jorgensen v. Meade Johnson Laboratories, Inc.*, 483 *F.2d* 237 (10th Cir.1973), a federal Court of Appeals applying Oklahoma law reinstated a complaint seeking damages on behalf of a deceased child, and a living mongoloid child whose birth deformities allegedly were caused by birth control pills taken by the mother prior to pregnancy. Rejecting the District Court's

view that tortious conduct prior to conception is not actionable, absent legislative authorization, by an infant injured by the wrong, the Court of Appeals observed that under that analysis "an infant suffering personal injury from a defective food product, manufactured before his conception, would be without remedy." *Id.* at 240. The Court of Appeals concluded that Oklahoma courts would recognize a preconception tort cause of action. *Ibid.* Similarly, in *Bergstreser v. Mitchell,* 577 *F.*2d 22 (8th Cir.1978), another federal Court of Appeals, applying Missouri law, upheld a preconception tort cause of action by a child who alleged that defendants' malpractice in performing a Caesarean section on the mother during a prior pregnancy caused her uterus to rupture during her subsequent pregnancy with plaintiff, resulting in premature delivery and serious impairments. Acknowledging the lack of authoritative precedent, the Court of Appeals concluded on the basis of Missouri caselaw concerning prenatal injuries that Missouri courts would recognize a cause of action based on a preconception tort. *Id.* at 25–26.

*Renslow v. Mennonite Hospital,* 67 *Ill.*2d 348, 10 *Ill.Dec.* 484, 367 *N.E.*2d 1250 (1977), was the first of several preconception tort cases that implicated erythroblastosis fetalis, the condition that caused the injuries for which Joseph Lynch seeks damages. In *Renslow,* a mother who had Rh negative blood was transfused in 1965 with Rh positive blood by defendant, resulting in 1974 in the premature birth and severe damage to her infant child because of the mother's Rh isoimmunization. Defendant contended that at the time of the transfusion it owed no duty to the infant plaintiff, and that because the mother was transfused at the age of thirteen her subsequent pregnancy approximately eight years later was an unforeseeable intervening act. *Id.* 10 *Ill.Dec.* 484, 367 *N.E.*2d at 1253. Defendant also stressed that the potential for indeterminate liability for a single wrongful act argued against recognition of a preconception tort cause of action. *Id.* 10 *Ill.Dec.* 484, 367 *N.E.*2d at 1255. Rejecting defendant's contentions, the Illinois Supreme Court, 4–3, remanded the case for trial observing that "it is not necessary that the legal duty be owed to one in existence at the time of the wrongful act." *Id.* 10 *Ill.Dec.* 484, 367 *N.E.*2d at 1256.

A number of cases from other jurisdictions subsequently have recognized malpractice causes of action based on preconception torts. *See, e.g., Empire Casualty Co. v. St. Paul Fire & Marine Ins. Co.,* 764 P.2d 1191 (Colo.1988) (recognizing cause of action for preconception tort based on allegation that obstetrician's mismanagement of mother's prior pregnancy including failure to diagnose and test mother's Rh isoimmunization was proximate cause of severe injuries to child of subsequent pregnancy); *Walker v. Rinck,* 604 N.E.2d 591 (Ind.1992) (recognizing causes of action for preconception tort by children of subsequent pregnancies who sustained injuries caused by erythroblastosis fetalis because of laboratory's and physician's failures during prior pregnancies to identify mother's Rh negative blood and to prescribe Rhogam); *Monusko v. Postle,* 175 Mich.App. 269, 437 N.W.2d 367 (1989) (recognizing preconception tort cause of action for child born with rubella syndrome based on allegations that physicians who treated mother during earlier pregnancy failed to test or immunize mother for rubella); *Lough v. Rolla Women's Clinic, Inc.,* 866 S.W.2d 851 (Mo.1993) (recognizing infant's preconception tort claim based on allegations that medical center's misidentification of mother's Rh negative blood as Rh positive led to doctor's failure to administer Rhogam following earlier pregnancy causing mother's Rh isoimmunization to inflict severe damage to child of subsequent pregnancy); *Graham v. Keuchel,* 847 P.2d 342 (Okla.1993) (recognizing preconception tort cause of action in suit for mother's injuries and child's wrongful death based on allegation that physicians during prior pregnancy failed to determine mother's Rh negative blood type or to prescribe Rhogam, resulting in the death of child of subsequent pregnancy due to erythroblastosis fetalis; reversing jury verdict for defendants in part because jury misled by erroneous instruction that mother's "election" to become pregnant with knowledge of her condition broke chain of causation and insulated defendants from liability).

Two New York Court of Appeals decisions have declined to recognize preconception tort causes of action, one in a medical

malpractice suit and the other in a strict liability context. In *Albala v. City of New York*, 54 *N.Y.2d* 269, 445 *N.Y.S.2d* 108, 429 *N.E.2d* 786 (1981), characterized as a "thinly reasoned case," *Prosser and Keeton, supra*, at 369, an action on behalf of a brain-damaged infant plaintiff was based on allegations that his mother, four years prior to his conception, underwent an abortion at Bellevue Hospital in the course of which her uterus was perforated. The complaint alleged that defendants' malpractice in perforating her uterus was a proximate cause of the injuries to her infant child during the subsequent pregnancy. Affirming the lower courts' dismissal of the claim, the Court of Appeals declined to recognize a preconception tort cause of action, observing that "[t]he perimeters of liability although a proper legislative concern, in cases such as these, cannot be judicially established in a reasonable and practical manner." *Id.* 445 *N.Y.S.2d* 108, 429 *N.E.2d* at 788. In *Enright v. Eli Lilly & Co.*, 77 *N.Y.2d* 377, 568 *N.Y.S.2d* 550, 570 *N.E.2d* 198, *cert. denied*, 502 *U.S.* 868, 112 *S.Ct.* 197, 116 *L.Ed.2d* 157 (1991), the issue presented was whether the liability of manufacturers of the drug diethylstilbesterol (DES) should extend to the granddaughter of a woman who ingested the drug. Plaintiffs Karen Enright and her parents, Patricia and Earl, alleged that Karen's maternal grandmother ingested DES during a pregnancy that resulted in Patricia's birth, and that because of Patricia's *in utero* exposure to DES she developed deformities in her reproductive system. Those deformities allegedly resulted in the premature birth of Karen who suffers from cerebral palsy and other disabilities. Declining to recognize a preconception strict-liability cause of action, the Court of Appeals concluded that Karen's reliance on preconception harm caused by her mother's *in utero* exposure to DES posed the same vexing questions with the same "staggering implications" as did *Albala, supra. Id.* 568 *N.Y.S.2d* 560, 570 *N.E.2d* at 203.

## B

As noted, *supra* at 219, 744 *A.2d* at 118–19, the trial court determined that its finding at the *Lopez* hearing that the Lynches

intentionally conceived Joseph with knowledge that Mrs. Lynch's Rh negative condition posed a risk to future pregnancies constituted a supervening cause of Joseph's condition precluding the imposition of liability on defendant Scheininger. The Appellate Division disagreed. It held that the trial court's determination at the *Lopez* hearing concerning the Lynches' knowledge of risks posed by Mrs. Lynch's Rh negative blood when they conceived Joseph was not an adjudication on the merits of that issue because neither collateral estoppel nor the law of the case doctrine was applicable. 314 *N.J.Super.* at 326–27 n. 6, 714 *A.*2d 970. Moreover, assuming the Lynches "were aware of Mrs. Lynch's Rh sensitive condition and that it created a greater than normal risk in connection with any future pregnancy," *ibid.*, the Appellate Division held that the "voluntary decision to conceive another child did not constitute a supervening cause of Joseph's disabilities." *Id.* at 329, 714 *A.*2d 970.

In view of our ultimate disposition of this appeal, and because we agree with the Appellate Division's holding that neither on the basis of collateral estoppel nor the law of the case doctrine can the trial court's determination at the *Lopez* hearing constitute an adjudication on the merits of the extent of the Lynches' knowledge of the risk posed by Mrs. Lynch's Rh condition at the time of Joseph's conception, that factual question will have to be adjudicated at the retrial. Nevertheless, the Appellate Division's disposition requires us to consider the issue of superseding cause.

The general principles governing intervening and superseding causes are well settled. Only their application is difficult. The *Restatement*'s definition of superseding cause is simple and straightforward:

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.
>
> [*Restatement (Second) of Torts* § 440 comment b (1965).]

The conceptual issue whether an intervening cause should relieve a defendant of responsibility for his or her prior negligence has been accurately characterized as a question of policy and fairness:

On its face, the problem is one of whether the defendant is to be held liable for an injury to which the defendant has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which the defendant is not responsible. In its essence, however, it becomes again a question of the extent of the defendant's original obligation; and once more the problem is not primarily one of causation at all, since it does not arise until cause in fact is established. It is rather one of the policy as to imposing legal responsibility. The older cases tend to ask the question, why should the defendant be held liable for harm brought about by something for which the defendant is not responsible? The later ones tend to ask instead, why should the defendant be relieved of liability for something as to which the defendant's conduct is a cause, along with other causes? For this reason, the Restatement has stated the problem in terms of whether there is a superseding cause.

[*Prosser and Keeton, supra,* § 44 at 301.]

Because the number and kinds of causes that can intervene after a defendant's negligence are virtually without limit, courts have attempted to resolve questions of superseding cause by focusing on whether the intervening cause is so closely connected with the defendant's negligent conduct that responsibility should not be terminated. *Id.* at 302. The shorthand term for that inquiry is whether the intervening cause is "foreseeable," an undefined term covering a "multitude of sins." *Ibid.*

The Restatement of Torts has attempted to categorize factors that influence the decision to treat an intervening event as a superseding cause:

The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

[*Restatement (Second) of Torts* § 442 (1965).]

Our caselaw reflects a pragmatic application of the doctrine of superseding cause, focusing on the specific facts and circumstances that raise the issue irrespective of whether the intervening event involved negligent or intentional conduct by others. In *Rappaport v. Nichols*, 31 *N.J.* 188, 192, 156 *A.2d* 1 (1959), for example, plaintiff, individually and as administratrix of the estate of Arthur Rappaport, sought damages from the owners of several taverns that knowingly had sold liquor to an intoxicated minor whose subsequent negligent operation of a motor vehicle was responsible for Rappaport's death. The tavern owners contended that, even if their conduct was unlawful and negligent, the minor's intervening negligent operation of his automobile was a superseding cause that extinguished their liability. *Id.* at 203, 156 *A.2d* 1. Rejecting that contention and reinstating plaintiffs' cause of action, this Court observed:

> The defendants contend that, assuming their conduct was unlawful and negligent as charged in the complaint, it was nevertheless not the proximate cause of the injuries suffered. But a tortfeasor is generally held answerable for the injuries which result in the ordinary course of events from his negligence and it is generally sufficient if his negligent conduct was a substantial factor in bringing about the injuries. The fact that there were also intervening causes which were foreseeable or were normal incidents of the risk created would not relieve the tortfeasor of liability. Ordinarily these questions of proximate and intervening cause are left to the jury for its factual determination.

[*Ibid.* (citations omitted).]

*See also, J.S. v. R.T.H.*, 155 *N.J.* 330, 352, 714 *A.2d* 924 (1998) (holding that prolonged sexual abuse of neighboring adolescent girls by defendant's husband with known proclivity for such behavior not a superseding cause of wife's negligent failure to warn victims or take other reasonable steps to prevent harm to them); *Cowan v. Doering*, 111 *N.J.* 451, 465–66, 545 *A.2d* 159 (1988) (affirming judgment after jury verdict for plaintiff hospitalized after overdosing on sleeping pills in earlier suicide attempt

who claimed that physicians, nurses, and hospital negligently failed to prevent her jumping from second-story hospital room, and holding that issue whether plaintiff's leap from hospital room constituted superseding cause insulating defendants from liability properly was submitted to trial jury for resolution); *Parks v. Pep Boys*, 282 *N.J.Super.* 1, 8–12, 659 *A.2d* 471 (App.Div.1995) (affirming denial of summary judgment on liability and holding that question whether decedent's voluntary inhalation of Freon sold by defendant to decedent's fourteen-year-old companion constituted superseding cause that barred defendant's liability for negligent sale of Freon raised causation issue for determination by jury at trial).

In other contexts, our courts have determined that intervening events constituted superseding causes as a matter of law, where such events were sufficiently extraordinary or so clearly unrelated to the antecedent negligence that imposition of liability would be unreasonable. See *Caputzal v. Lindsay Co.*, 48 *N.J.* 69, 77–80, 222 *A.2d* 513 (1966) (holding that even if defect in water softener caused rusty discoloration of water, manufacturer was not liable to plaintiff who suffered idiosyncratic and unanticipated heart attack brought on by fright at sight of discolored water); *Meyer v. Board of Ed. of Middletown Twp.*, 9 *N.J.* 46, 54–55, 86 *A.2d* 761 (1952) (affirming directed verdict for defendants and holding that even assuming school board's negligence in failing to install guard over belt-drive mechanism of power jig saw, intervening act of classmate in throwing electric switch that started jig saw while plaintiff was cleaning it constituted superseding cause that broke chain of causation and insulated school board from liability); *Glaser v. Hackensack Water Co.*, 49 *N.J.Super.* 591, 600–01, 141 *A.2d* 117 (App.Div.1958) (holding that water company whose employee entered plaintiffs' garage without notice to read meter was insulated from liability by intervening act of plaintiff who became frightened for safety of infant daughter and injured herself while running down stairs to first floor to ascertain who had entered garage).

## C

As noted, the doctrine of superseding cause focuses on whether events or conduct that intervene subsequent to the defendant's negligence are sufficiently unrelated to or unanticipated by that negligence to warrant termination of the defendant's responsibility. A related doctrine that may be implicated on retrial is that of avoidable consequences, a doctrine that focuses on diminution of damages on the basis of a plaintiff's failure to avoid the consequences of a defendant's tortious conduct. That doctrine's relevance on remand will depend on whether the proofs would sustain a jury finding that the Lynches decided to conceive another child notwithstanding their knowledge that Mrs. Lynch's pregnancy bore a significant risk of an unfavorable outcome. In contrast to contributory or comparative negligence,

> [t]he doctrine of avoidable consequences comes into play at a later stage. Where the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine [avoidable consequences] limits the plaintiffs' recovery by disallowing only those items of damages which could reasonably have been averted * * * [.] "[C]ontributory negligence is to be asserted as a complete defense, whereas the doctrine of avoidable consequences is not considered a defense at all, but merely a rule of damages by which certain particular items of loss may be excluded from consideration * * *." *McCormick on Damages,* West Publishing Company, 1935, Chapter 5, Avoidable Consequences, pages 127 *et seq.;* see also 61 *Harvard Law Review* (1947), 113, 131–134, Developments in Damages. Recognized universally, it is nonetheless understandable that variable conceptual explanations are given ranging from contributory negligence, as such, lack of proximate cause and a so-called "duty" to mitigate.
>
> [*Southport Transit Co. v. Avondale Marine Ways, Inc.,* 234 *F.*2d 947, 952 (5th Cir.1956) (footnotes omitted).]

We cannot improve on Justice O'Hern's explanation of the doctrine of avoidable consequences in *Ostrowski v. Azzara,* 111 *N.J.* 429, 437, 545 *A.*2d 148 (1988):

> Related in effect, but not in theory, to the doctrine of contributory negligence is the doctrine of avoidable consequences. This doctrine has its roots in the law of damages. It has application in the law of contract, as well as in the law of torts. *N.J. Indus. Properties, Inc. v. Y.C. & V.L., Inc.,* 100 *N.J.* 432, 461, 495 *A.*2d 1320 (1985) (Stein, J., dissenting) (quoting 5A *Corbin,* Contracts § 1039 at 241 (1964)). The doctrine proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he could have avoided. See W. Keeton, D. Dobbs, R.

Keeton, D. Owen, *Prosser and Keeton on The Law of Torts* § 65 at 458–59 (5th Ed.1984) (hereinafter Prosser and Keeton); 62 *A.L.R.*3d 9 (1975) (discussing duty to minimize tort damages by surgery). It has a simple thesis of public policy:

[I]t is not true that the injured person has a duty to act, nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from wasting their resources, both physical or economic. [*Restatement (Second) of Torts* § 918 at 500, comment a.]

Avoidable consequences, then, normally comes into action when the injured party's carelessness occurs *after* the defendant's legal wrong has been committed. Contributory negligence, however, comes into action when the injured party's carelessness occurs *before* defendant's wrong has been committed or concurrently with it. Prosser and Keeton, *supra*, § 65 at 458–59; *see also Ayers v. Jackson Township*, 106 *N.J.* 557, 603, 525 *A.2d* 287 (1987) (" 'under the "avoidable consequences rule," [a claimant] is required to submit to treatment that is medically advisable; failure to do so may bar future recovery for a condition he could thereby have alleviated or avoided.' ") (quoting *Hagerty v. L & L Marine Servs., Inc.*, 788 *F.*2d 315, 319 (5th Cir.1986)).

[*Id.* at 437–38, 545 *A.2d* 148 (footnote omitted).]

In *Ostrowski, supra,* in which we held that the plaintiff's post-operative health habits could limit the damages recoverable for defendant's allegedly negligent toenail surgery, Justice O'Hern emphasized that even if the plaintiff did not follow her physician's post-operative instructions, that conduct would not extinguish defendant's liability but would instead diminish the recoverable damages:

[I]t would be the bitterest irony if the rule of comparative negligence, designed to ameliorate the harshness of contributory negligence, should serve to shut out any recovery to one who would otherwise have recovered under the law of contributory negligence. Put the other way, absent a comparative negligence act, it would have never been thought that "avoidable consequences" or "mitigation of damages" attributable to *post-accident* conduct of any claimant would have included a shutout of apportionable damages proximately caused by another's negligence. Negligent conduct is not "immunized by the concept of 'avoidable consequences.' This argument should more properly be addressed to the question of diminution of damages; it does not go to the existence of a cause of action." *Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*, 82 *N.J.Super.* 281, 306, 197 *A.*2d 569 (App.Div.1963), *certif. denied,* 42 *N.J.* 501, 201 *A.*2d 580 (1964); see also *Flynn v. Stearns*, 52 *N.J.Super.* 115, 120–21, 145 *A.*2d 33 (App.Div.1958) ("Where the fault of the patient was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician, it *only affects* 'the amount of the damages recoverable by the patient.' " (emphasis added) (citation omitted)); *Restatement (Second) of Torts*, § 918 at 500 and comment a (doctrine of avoidable

consequences "applies only to the diminution of damages and not to the existence of a cause of action").

[*Ostrowski, supra,* 111 *N.J.* at 441–42, 545 *A.*2d 148.]

Depending on the proofs elicited at retrial concerning the substance of warnings given to the Lynches after the 1984 still-birth about the risks to be anticipated from future pregnancies, the court may be required to instruct the jury concerning the doctrine of avoidable consequences and its application to the Lynches' decision to conceive Joseph.

## III

■ We are fully in accord with both the Law Division's and the Appellate Division's determinations that New Jersey would recognize a medical malpractice cause of action based on preconception negligence that allegedly resulted in injury to a child conceived after the negligence occurred. We reject the contention advanced by some that the physician whose negligence gives rise to the claim owes no duty to a child not yet conceived. In the fields of obstetrics and gynecological surgery, the relationship between a physician's responsibilities and the possibility of consequences to the mother that affect future pregnancies is well understood. Moreover, our Court's conception of foreseeability as a determinant of duty is of sufficient breadth to accommodate the principle that in appropriate circumstances a physician's duty should extend to children conceived after the physician's negligence occurred:

The probability of injury by one to the legally protected interest of another is the basis for the law's creation of a duty to avoid such injury, and foresight of harm lies at the foundation of the duty to use care and therefore of negligence. The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances. Negligence is clearly relative in reference to the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care. In other words, damages for an injury resulting from a negligent act of the defendant may be recovered if a reasonably prudent and careful person should have anticipated, under the same or similar circumstances, that injury to the plaintiff or to those in a like situation would probably result.

[*Hill v. Yaskin,* 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977) (quoting 57 *Am.Jur.*2d Negligence § 58 (1970)) (footnotes omitted).]

██ We also do not share the concern expressed by the New York Court of Appeals in *Albala, supra,* 445 *N.Y.S.*2d 108, 429 *N.E.*2d at 788, that "[t]he perimeters of liability ... cannot be judicially established in a reasonable and practical manner." Our jurisprudence is sufficiently pragmatic to establish appropriate boundaries for a cause of action sounding in preconception negligence. In tort cases, "[l]iability depends not only on the breach of a standard of care but also on a proximate causal relationship between the breach of the duty of care and resultant losses." *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 264, 495 *A.*2d 107 (1985). We have defined proximate cause as "that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *Ibid.* (quoting *Caputzal, supra,* 48 *N.J.* at 77–78, 222 *A.*2d 513) (quoting *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734, 119 *A.* 273 (Sup.Ct.1923), *aff'd o.b.,* 98 *N.J.L.* 893, 121 *A.* 926 (E. & A.1923)). The contention that the recognition of potential liability for a preconception tort imposes on defendants an unlimited and unfair exposure to claims for damages attributable to subsequent pregnancies occurring long after the antecedent negligence is overstated. Our proximate cause jurisprudence is sufficiently flexible to bar claims for injuries that are unreasonably remote in relation to the defendant's negligence. Whatever the outer limits of the preconception tort cause of action may be, we have no sense that those limits are exceeded by the claims asserted on Joseph's behalf against Dr. Scheininger.

██ Based on this trial record, we also agree with the Appellate Division's conclusion that "Mr. and Mrs. Lynch's voluntary decision to conceive another child did not constitute a supervening cause of Joseph's disabilities [that] precludes him from pursuing a malpractice claim against Dr. Scheininger." 314 *N.J.Super.* at 329, 714 *A.*2d 970. As the Appellate Division implied, and we agree, its decision on that issue might have been different if the

undisputed evidence at trial demonstrated that the Lynches knew after the 1984 stillbirth that a high likelihood existed that a child of a subsequent pregnancy would not survive or would be born with serious abnormalities. *Id.* at 330–31, 714 *A.*2d 970. No such evidence was adduced. Defendant's expert, Dr. Quartell, testified that if not for the malpractice of Dr. Grochmal, the obstetrician responsible for Mrs. Lynch's pregnancy with Joseph, in failing to recognize and treat the Rh isoimmunization, "in all likelihood this baby would be healthy today." Dr. Seitzman, Dr. Scheininger's associate who performed the Caesarean section resulting in the 1984 stillbirth, testified that in explaining the cause of the infant's death to Mrs. Lynch he did not use the term "erythroblastosis fetalis" or attempt to elaborate on that condition because of its complexity, but instead attributed the stillbirth to a large clot in the infant's umbilical cord. He further testified that he "suggested" to Mrs. Lynch that "another pregnancy would be risky, especially in the event that she had two healthy children with a prior marriage."

Although other evidence at trial—such as the autopsy report and the Lynches' consultation with high-risk pregnancy specialists—suggested a likelihood that the Lynches may have understood that the cause of the 1984 stillbirth could have negative implications for future pregnancies, the evidence on that issue was far from compelling. Moreover, Dr. Grochmal, who attended Mrs. Lynch during her pregnancy with Joseph, obviously was unaware of her Rh isoimmunization. Significantly, Dr. Quartell's expert testimony that notwithstanding the high level of Mrs. Lynch's antibody production her pregnancy with Joseph could have been managed successfully suggests that the Lynches' decision to attempt to have another child may have been medically reasonable.

 Our articulation of the effect of intervening events on questions of causation focuses on whether such events are foreseeable, *Rappaport, supra,* 31 *N.J.* at 203, 156 *A.*2d 1, but that emphasis is essentially a shorthand equivalent for the broader inquiry of whether imposing liability despite the intervening cause

is reasonable under all the circumstances. *Prosser and Keeton, supra*, § 44 at 301. On this record, we find no basis for concluding that the Lynches' decision to conceive Joseph constituted a superseding cause that extinguished Dr. Scheininger's liability as a matter of law. (We note that defendant has not asserted that Dr. Grochmal's negligence during Mrs. Lynch's pregnancy with Joseph was a superseding cause that precluded imposition of liability on defendant, and we do not address that issue.) As the Appellate Division observed, "[t]he desire to bear children is one of the most basic human instincts." 314 *N.J.Super.* at 328, 714 *A.*2d 970. Despite the stillbirth that terminated the 1984 pregnancy, the Lynches' decision to conceive additional children was entirely foreseeable in the absence of information or a warning that a subsequent pregnancy involved risks of such magnitude that a high likelihood existed that the child either would not survive or would be born with serious disabilities. The record of this trial is, at best, ambiguous about whether such information or warnings were provided to the Lynches. Because the question whether an intervening event supersedes a defendant's liability for antecedent negligence ordinarily is one for jury determination, *Rappaport, supra*, 31 *N.J.* at 203, 156 *A.*2d 1, we agree with the Appellate Division that the trial court erred in dismissing as a matter of law Joseph's claim against Dr. Scheininger on that ground. If on retrial a factual issue is presented about whether the Lynches knew that a high likelihood existed that a child of a subsequent pregnancy either would not survive or would be born with serious disabilities, we acknowledge that such a finding would supercede defendant's liability for his antecedent negligence.

For the guidance of the trial court on remand, we add these additional observations on the issue of apportionment of responsibility. We note that the trial court properly instructed the jury at the first trial to apportion responsibility for Joseph's injuries between defendant Scheininger and Dr. Grochmal, the obstetrician responsible for Mrs. Lynch's pregnancy with Joseph and with whom plaintiffs settled before trial, see *Young v. Latta,*

123 *N.J.* 584, 586, 589 *A.*2d 1020 (1991), and also instructed the jury in accordance with the principles set forth in *Scafidi v. Seiler,* 119 *N.J.* 93, 113–14, 574 *A.*2d 398 (1990). As noted, *supra* at 230–32, 744 *A.*2d at 125–26, another apportionment of responsibility issue for the jury may arise if the testimony at retrial concerning the extent of the Lynches' knowledge of the risks implicated by Mrs. Lynch's pregnancy with Joseph raises a jury question whether that pregnancy constituted an avoidable consequence that should diminish defendant Scheininger's responsibility for Joseph's injuries.

> What constitutes reasonable efforts to avoid the consequences of a defendant's wrongdoing is the problem in this field most often faced in recent cases. The burden of showing that the plaintiff failed to act reasonably is on the wrongdoer who seeks to limit his own liability, and, normally whether or not reasonable efforts have been employed is a jury question.
>
> [Developments in the Law—Damages—1935–1947, 61 *Harv. L. Rev.* 113, 131 (1947).]

Our caselaw on the question of the effect of a patient's failure to avoid some or all of the likely consequences of a physician's negligence is not well developed. In *Flynn v. Stearns,* 52 *N.J.Super.* 115, 145 *A.*2d 33 (1958), the Appellate Division reversed a jury verdict for defendant in a medical malpractice case involving allegedly negligent surgical repair of a fractured humerus because the trial court instructed the jury that it could find the eight-year-old plaintiff's failure to continue stretching exercises recommended by defendant to constitute contributory negligence that barred recovery even if defendant was negligent. In reversing, the Appellate Division agreed with plaintiff's contention that

> [w]here the fault of the patient was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician, it only affects "the amount of the damages recoverable by the patient." This is a correct general statement of the law. Appellant says that since here the fault, if any, of the plaintiff was subsequent to the fault of the defendant it was not a proximate contributing cause of the injury, and it should have been submitted to the jury, if at all, only as bearing on the issue of damages, and not as a basis for a finding of contributory negligence.
>
> [*Flynn, supra,* 52 *N.J.Super.* at 120–21, 145 *A.*2d 33 (citations omitted).]

The court added that

[i]f the defendant was negligent in the respects charged by plaintiff, plaintiff's failure to exercise "was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician" and therefore it affected only "the amount of the damages recoverable by the patient."

[*Id.* at 123–24, 145 *A.*2d 33 (quoting 41 *Am.Jur.* Physicians & Surgeons, § 80, p. 199).]

Our leading case on the doctrine of avoidable consequences is *Ostrowski, supra,* 111 *N.J.* 429, 545 *A.*2d 148, where the plaintiff, an overweight, diabetic smoker, allegedly exacerbated the effects of defendant's negligent removal of her left big toenail by failing to maintain her weight, diet, and blood sugar at acceptable levels. *Ibid.* The trial court allowed the jury to find that plaintiff's post-operative health habits constituted comparative negligence that could bar recovery rather than reduce damages. *Ibid.* Reversing, we held that under the doctrine of avoidable consequences a plaintiff's post-negligence conduct that increased the risk of harm from defendant's negligence could be considered by the jury as fault-based conduct that would reduce plaintiff's damages but would not bar recovery. *Id.* at 443, 545 *A.*2d 148. We cited with approval the Uniform Comparative Fault Act (U.C.F.A.) 12 *U.L.A.* 38 (1988 Supp.), which includes in its definition of fault an "unreasonable failure to avoid an injury or to mitigate damages." *U.C.F.A.* § 1(b).

The primary holding of *Ostrowski* may apply to the retrial of this matter. If evidence is adduced that would permit the jury to find that the risks of another pregnancy were significant enough that the Lynches' decision to conceive Joseph, although clearly a foreseeable consequence of defendant's negligence, constituted a deliberate election not to avoid the known but unquantified risk of future injury, the jury may be instructed to consider that evidence as bearing on the apportionment of responsibility for Joseph's injuries under the avoidable consequences doctrine. We note that pursuant to the Proposed Final Draft of the chapter of the American Law Institute's *Restatement (Third)*

*of Torts* dealing with Apportionment of Liability, among the factors material to assigning shares of responsibility is "the character and nature of each person's risk-creating conduct," irrespective of whether evidence of that conduct is necessary to prove or disprove a claim or defense. *Restatement (Third) of Torts: Apportionment of Liability* § 8 comment c (Proposed Final Draft, March 22, 1999). The *Restatement*'s discussion implies that risk-creating conduct, whether or not an element of a cause of action, may be germane to the apportionment of damages.

We acknowledge that in *Ostrowski* it was plaintiff's conduct that increased the risk of harm from defendant's negligence, whereas the risk-avoidance issue in this case relates to the conduct of the Lynches, Joseph's parents. Nevertheless, in terms of the fair allocation of responsibility to defendant Scheininger the relevance, if proved, of the Lynches' election to assume the risks of a subsequent pregnancy would be clear and compelling. We would not characterize the Lynches' election to conceive a child as fault-based because the decision to procreate is so fundamentally subjective, and no standard of objective reasonableness adequately could inform a decision about whether the determination to assume the risks of conception was a reasonable one. Nevertheless, we reiterate our observation in *Ostrowski* that "given the understandable complexity of concurrent causation," characterizing plaintiffs' decision to bear that risk "as a percentage of fault [that] reduces plaintiff's damages may aid juries in their just apportionment of damages." *Ostrowski, supra,* 111 *N.J.* at 443, 545 *A.*2d 148.

The automobile seat-belt cases offer a rough analogy to the apportionment of responsibility methodology that we contemplate. In *Waterson v. General Motors Corp.,* 111 *N.J.* 238, 544 *A.*2d 357 (1988), we held that in an automobile accident proximately caused by a defendant's negligence, only those additional damages incurred as a partial result of the plaintiff's failure to wear a seat belt are subject to an apportionment of responsibility between the parties. However, those damages that would have been incurred

irrespective of plaintiff's failure to wear a seat belt were not subject to apportionment. *Id.* at 241–42, 544 *A.*2d 357. In the context of this record, we would regard the damages resulting from Brian's stillbirth as damages for which defendant (and his colleagues in that delivery) are solely responsible, and the responsibility for damages resulting from Joseph's disabilities as being allocable among defendant and Dr. Grochmal as tortfeasors, and the Lynches under the avoidable consequences doctrine.

Depending on the record at retrial, the trial court on remand will make the ultimate discretionary determination whether the jury should be instructed to apportion responsibility for Joseph's injuries in accordance with the doctrine of avoidable consequences. If that instruction is given, we contemplate that the trial court, consistent with *Ostrowski, supra,* 111 *N.J.* at 443, 545 *A.*2d 148, will permit the jury to treat the Lynches' election to conceive Joseph and bear the risk of an adverse result as fault-based for purposes of the jury's allocation of responsibility for Joseph's damages.

We acknowledge that permitting the parents' willingness to bear the risk of conception to bear on Joseph's recovery of damages stretches the contours of traditional applications of comparative fault. Our conclusion that such an apportionment of responsibility for Joseph's injuries is appropriate reflects our pragmatic evaluation of the respective alleged causes of those injuries. "It is not clear that an apportionment based on fault, as required by most Canadian and American statutes, will lead to different results from one based on causation." H.L.A. Hart & T. Honore, *Causation in the Law* 234 (2d ed.1985). As we observed in a different context in *Procanik by Procanik v. Cillo,* 97 *N.J.* 339, 354, 478 *A.*2d 755 (1984):

Underlying our conclusion is an evaluation of the capability of the judicial system, often proceeding in these cases through trial by jury, to appraise such a claim. Also at work is an appraisal of the role of tort law in compensating injured parties, involving as that role does, not only reason, but also fairness, predictability,

and even deterrence of future wrongful acts.... [T]he ultimate decision is a policy choice summoning the most sensitive and careful judgment.

[*Id.* at 354, 478 *A.*2d 755.]

## IV

We affirm the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.