818 A.2d 402 (2003)
358 N.J. Super. 437
Milda GELER, Individually, As Guardian Ad Litem for Shannon Faynin, an infant And Edward Faynin, Plaintiff-Appellants,
v.
Dr. Richard AKAWIE, Obstetrical and Gynecological Group of East Brunswick, P.A., Defendant-Respondents,
v.
Dr. Michael Weingarten, M.D., Defendant-Respondent Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 18, 2002.
Decided March 3, 2003.
*406 Robert Solomon, Livingston, argued the cause for appellants (Nagel Rice Dreifuss & Mazie attorneys; Bruce H. Nagel of counsel and on the brief).
James M. Ronan, Jr., Tinton Falls, argued the cause for respondents (Ronan, Tuzzio & Giannone attorneys; Mr. Ronan of counsel and on the brief with Anthony M. Tracy).
Sean P. Buckley, Princeton, argued the cause for respondent-cross-appellant (Buckley & Theroux attorneys; Mr. Buckley of counsel, Karla M. Donovan on the brief).
Before Judges HAVEY, WELLS, and PAYNE. *403 *404
*405 The opinion of the court was delivered by PAYNE, J.A.D.
In this wrongful birth case, plaintiffs Milda Geler and Edward Faynin, the parents of a child who was born with Tay-Sachs disease and died just before the age of two, claimed malpractice on the part of obstetricians Richard Akawie and Michael Weingarten as the result of their alleged failure to provide genetic counseling regarding the disease, to inform them of the availability of tests to determine whether they and their offspring carried the recessive gene causing the disease, and to follow up once it became apparent that initial paternal testing had not been conducted.
Following trial, the jury returned a verdict in favor of Akawie, the doctor who saw plaintiffs on their first visit on December 11, 1996 and on March 21, 1997, and against Weingarten, the doctor who saw them on three occasions commencing on January 2, 1997 and continuing through February 18, 1997, and then for an additional visit on April 24, 1997.[1] The jury awarded damages to plaintiffs for emotional distress in the total amount of $500,000, divided equally between them. However, that amount was reduced by one-third as the result of the operation of the doctrine of avoidable consequences, which the trial judge found to be applicable to the case. A judgment for the reduced amount, stipulated medical expenses and prejudgment interest was entered.
Prior to entry of judgment, Weingarten timely moved for a judgment notwithstanding the verdict (j.n.o.v.), claiming that plaintiffs had not demonstrated liability on his part or legally cognizable damages for emotional distress. The motion was denied as to liability and granted as to damages. Weingarten's alternative "conditional" motion for a new trial as the result of alleged attorney misconduct was denied. However, that denial did not constitute a determination on the merits of the conditional motion. The trial judge observed *407 that it would have been granted if defendant had not prevailed on his motion for j.n.o.v. on the issue of emotional distress damages.
Plaintiffs appeal from entry of the order granting Weingarten's motion for j.n.o.v. on damages for emotional distress and from various rulings by the trial judge of relevance if the case is to be retried. Weingarten has cross-appealed, claiming error in the court's failure to grant a j.n.o.v. in his favor on liability or a new trial on liability and damages as the result of alleged misconduct on the part of plaintiffs' attorney, Bruce H. Nagel. We reverse and remand the case for a retrial of plaintiffs' liability and damage claims against Weingarten.

I.
Tay-Sachs disease is a genetically-inherited, incurable condition that first appears in an infant at approximately six months of age, progressively causing mental retardation, blindness, seizures, and death between the ages of two and four years. The disease is most prevalent among Ashkenazi Jews, occurring in approximately one of 3,600 conceptions. Carrier testing of prospective parents and prenatal testing of the fetus are available for this disorder. The simplest test consists of a serum assay blood test performed on the father in a local lab. As an alternative, or as a necessary measure if the father's test result is positive, the mother can obtain a leukocyte assay test. However, only a limited number of laboratories perform that test, including Newark's Beth Israel Hospital. If both parents are found to carry the gene, a one in four chance exists that their children will be afflicted with the Tay-Sachs disease. Amniocentesis confirms the presence of the disease in an existing fetus. Parents who are informed that the disease has been transmitted may choose to abort an affected fetus.
On December 11, 1996, Geler was seen as a new patient by Akawie, one of five members of the Obstetrical and Gynecological Group of East Brunswick, P.A. Following a physical examination and testing that confirmed that Geler was eleven weeks pregnant, she and her husband, Faynin, met with Akawie in his office. What occurred during that office conference is sharply disputed by the parties. However, evidence at trial was sufficient for the jury to conclude that Akawie suggested at that time the possibility that Geler and Faynin, as Ashkenazi Jews, could each be carriers of the Tay-Sachs gene, provided information regarding the disease, advised testing, and directed Faynin to undergo the necessary serum assay blood test as quickly as possible. Testimony also provided a basis for the conclusion that Akawie gave Faynin the forms necessary to obtain the Tay-Sachs test at an outside lab. It is undisputed that Geler's medical records contain a notation by Akawie: "Husband for Tay-Sachs ASAP."[2] It is also undisputed that, at the end of the visit, Geler and Faynin were given a reference book on pregnancy, entitled A Miracle in the Making, that contained a section on genetic diseases, including Tay-Sachs, and a series of pamphlets, one of which, entitled Genetic Disorders, discussed the disease and its genetic origins. Both publications disclosed an increased risk among Ashkenazi Jews that they could serve as carriers of the Tay-Sachs gene, and they mentioned the availability of testing. It is not clear that either parents' attention focused on relevant portions of these materials. However, both understood that, as Jews, they *408 had an increased risk of carrying genes that could lead to inherited disease.
Akawie saw Geler again on March 21, 1997. Although her chart did not indicate that Tay-Sachs testing had been performed, and no testing was ordered on that date, a jury could have concluded, as Akawie testified, that testing was no longer a realistic option, since the fetus was viable and an abortion, although legal, would not have been performed. Defendants' medical expert, Dr. Richard Bodner, confirmed that the accepted standard of medical care did not permit performance of an abortion in New Jersey at the time that results from any test conducted on March 21 were received. However, he acknowledged that abortions were performed in other states through the twenty-seventh or twenty-eighth week of pregnancy.
In the interval between Geler's visits to Akawie on December 11, 1996 and March 21, 1997, she was seen on three occasions by another group member, Weingarten: on January 2, 1997, January 20, 1997 and February 18, 1997. Faynin accompanied Geler on these and all other visits. A significant dispute exists as to what was discussed during these office visits, as well. Geler and Faynin testified that no counseling regarding Tay-Sachs was given, no follow-up took place regarding the absence of test results, and no testing was offered. Weingarten testified to the contrary, stating that counseling was provided and testing was urged on January 2 and January 20, but likely did not occur on February 18. In any case, Geler's chart contains no reference to a further discussion of the disease, and the space reserved for Tay-Sachs testing results remained empty. No prescriptions or lab test forms for Tay-Sachs testing were given to Geler or Faynin by Weingarten. Additionally, no notation that testing was declined appears in the chart.
Substantial testimony was introduced at trial to establish a duty of follow-up on the part of Weingarten that was independent of Akawie's initial informational duty. Weingarten testified that office protocol, based on standard medical practice, required, if no test result were placed in the chart, that he determine whether Tay-Sachs testing had occurred and conduct additional genetic counseling if it had not. Akawie testified that a failure by Weingarten to determine whether Faynin and/or Geler had undergone Tay-Sachs testing and to emphasize the significance of the testing would have constituted a breach of the standard of care applicable to practicing obstetricians. That duty, the doctors contended, existed so long as test results could reasonably have been obtained prior to the crucial twenty-fourth week of pregnancy when abortion became unavailable. Dr. Stephen Leviss, a medical expert called by plaintiffs, also testified that the standard of care applicable to Weingarten required him to determine whether Tay-Sachs testing had been conducted, to reorder testing if it had not occurred, and to inform plaintiffs of the importance of the testing. However, it was his testimony that the duty extended throughout the pregnancy, regardless of the viability and advancing development of the fetus.
Plaintiffs' child, a girl that they named Shannon, was born on July 4, 1997. For the first five months of her life, she progressed normally. However, after that time, the child developed progressive neurological deficits which were diagnosed in late July 1998, after multiple consultations with experts, as symptoms of Tay-Sachs disease. Geler and Faynin determined that Shannon be cared for in the home. Her condition rapidly deteriorated. She experienced increasingly frequent seizures, *409 she became blind and paralyzed, lost her hearing, and became nonresponsive. Shannon died on June 1, 1999.
During the period of Shannon's illness, marital discord developed between Geler and Faynin, and they are now divorced. Faynin sometimes abuses alcohol. Both testified to the significant and ongoing emotional distress caused by their child's condition. Their testimony was corroborated by Shannon's treating physician, pediatric neurologist Dr. Arnold Gold, and by others. Neither obtained psychological treatment for their distress and neither lost time from work that was directly attributable to the distress.
Both Geler and Faynin testified that if they had been aware through Tay-Sachs testing that they were both carriers of the relevant gene, Geler would have undergone amniocentesis to determine whether their fetus was afflicted with the disease. Upon confirmation, they would definitely have terminated the pregnancy.

II.
Plaintiffs have not appealed from the judgment entered in favor of Akawie on March 15, 2001.[3] We therefore first address the argument presented by Weingarten in his cross-appeal that the trial court erred in refusing to grant a judgment n.o.v. in his favor on the issue of liability. Weingarten argues in this regard that the jury's verdict against him is inconsistent with its exoneration of Akawie, and therefore it cannot stand. Weingarten's argument depends upon the postulate that the duty owed by him to plaintiffs was identical to the duty owed by Akawie, so that satisfaction of that duty by Akawie precluded liability on his part. However, as the preceding summary of testimony at trial discloses, Weingarten, Akawie and plaintiffs' expert Leviss all established a duty of follow-up that differed from the initial informational duty imposed upon Akawie. Further, substantial evidence supported plaintiffs' position that the duty had been breached. We therefore find no error by the trial court in denying this aspect of Weingarten's motion for judgment n.o.v. Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544 (2000); Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969).

III.
We address next the arguments raised in plaintiffs' appeal that concern the standard of proof and evidence required to establish damages for emotional distress in this case. Plaintiffs argue in this regard that: (1) the trial judge employed the wrong standard of proof in formulating a jury charge concerning their claim of emotional distress arising from the wrongful birth of their genetically impaired daughter; (2) he erred in granting a judgment n.o.v. vacating the jury's damage award for emotional distress; and (3) he erred in barring evidence at trial of future emotional distress as the result of the absence of expert proof.
*410 The trial judge relied for the substance of his jury instruction on the standard of proof of emotional distress on the precepts expressed by the Supreme Court in Carey v. Lovett, 132 N.J. 44, 622 A.2d 1279 (1993), a case alleging injury to a mother and child from malpractice resulting in the premature birth of the child and in failure to recognize in a timely fashion that the child was born alive. The Carey Court held:
[T]o prove a claim for emotional distress arising out of the injury or death of a fetus, the mother must prove that she suffered emotional distress so severe that it resulted in physical manifestations or that it destroyed her basic emotional security. The father's emotional distress must be equally severe. The worry and stress that attend the birth of every child will not suffice. Nor will the upset that every parent feels when something goes wrong in the delivery room. In addition, the father must contemporaneously observe the malpractice and its effects on the victim. He must also be shocked by the results.
[Id. at 62, 622 A.2d 1279.]
Plaintiffs argue that the elevated standard imposed in Carey is not applicable in a case alleging injury to parents from the wrongful birth of a congenitally handicapped child. We agree. In doing so, we note a distinction between the judicial treatment of claims for parental emotional distress arising from negligence directed solely at the parents, as here, and claims for parental emotional distress arising from negligence also directly affecting their newborn child. This case falls within the former category, and thus squarely within Supreme Court precedent recognizing, without mention of an enhanced standard of proof, parental emotional distress as an element of damages in other genetic counseling malpractice contexts. See Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979)(failure to offer amniocentesis that would have disclosed Downs' Syndrome); Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834 (1981)(failure to timely diagnose cystic fibrosis in a sibling); Procanik by Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984)(failure to diagnose mother's German measles); and Canesi v. Wilson, 158 N.J. 490, 730 A.2d 805 (1999)(failure to inform mother of fetal risk from mother's ingestion of the drug Provera).[4]
The fact that the Court has chosen not to impose an elevated standard of proof in genetic counseling malpractice cases is a logical consequence of the Court's determination to recognize a cause of action in this context for injury sustained by parents, alone. "[A]t bottom," the injury that is alleged is deprivation of the parents' "option of making a meaningful decision as to whether to abort the fetus." Berman, supra, 80 N.J. at 430, 404 A.2d 8. A concern over expansion of liability beyond the foreseeable emotional consequences of the tort, or over duplication of recovery as the result of the overlapping claims of parents and child, is not implicated in this type of case and has no relevance here.
The line of cases premised upon wrongful birth resulting from inadequate genetic counseling is thus distinguishable from cases such as Carey in which negligent injury to a fetus causes an otherwise normal child to die shortly after birth, or *411 to be born in an impaired condition. Procanik, supra, 97 N.J. at 348, 478 A.2d 755. In wrongful birth cases, there is no claim that the negligence of the physician caused the child's impairments. The sole claim is that negligence precluded the parents' opportunity to decide whether to give birth to the impaired child in the first place. Thus, the parents' claim of injury is wholly independent from any claim asserted on the child's behalf. Schroeder, supra, 87 N.J. at 65, 432 A.2d 834; Procanik, supra, 97 N.J. at 356, 478 A.2d 755. The Court's recognition of a right to "accept or reject a parental relationship" thus "protects a distinctively personal interest." Canesi, supra, 158 N.J. at 501, 730 A.2d 805 (citing Hummel v. Reiss, 129 N.J. 118, 136, 608 A.2d 1341 (1992) (Handler, J., dissenting)).
Moreover, an award of damages for emotional distress has been recognized as one of the few avenues of redress for tortious conduct in this circumstance. The Berman Court held in the context of an alleged failure to inform prospective parents of the availability of amniocentesis as a means of detecting Downs Syndrome:
As in all other cases of tortious injury, a physician whose negligence has deprived a mother of this opportunity [to determine whether to undergo an abortion] should be required to make amends for the damage which he has proximately caused. Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects.
* * *
In failing to inform Mrs. Berman of the availability of amniocentesis, defendants directly deprived herand, derivatively, her husbandof the option to accept or reject a parental relationship with the child and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with Down's Syndrome.... We feel that the monetary equivalent of this distress is an appropriate measure of the harm suffered by the parents deriving from Mrs. Berman's loss of her right to abort the fetus.

[Id. at 432-33, 404 A.2d 8.]
Berman, thus, clearly establishes injury from emotional distress as a constituent element of a parent's consequential damages flowing from a physician's wrongful conduct in this wrongful birth context. "[T]he shock and bitterness of parents in having been deprived of any choice concerning the birth of their child" provides the basis for the damage award. Giardina v. Bennett, 111 N.J. 412, 416, 545 A.2d 139 (1988) (citing Berman and Schroeder).
There can be no doubt of the existence of such distress. "Without doubt, expectant parents, kept in ignorance of severe and permanent defects affecting their unborn child, suffer greatly when the awful truth dawns upon them with the birth of the child." Berman, supra, 80 N.J. at 438, 404 A.2d 8 (Handler, J., concurring in relevant part and dissenting in part). As the result of a physician's failure to adequately explain the consequences of parental action or inaction, the parents are deprived of the "opportunity to cushion the blow, mute the hurt, or prepare themselves as parents for the birth" of a seriously impaired child. Id. at 439, 404 A.2d 8.
Further, as those cases that follow and expand upon[5]Berman make clear, the *412 fact that the injury to the parents derives from the deprivation of their ability to choose whether to carry a fetus to term, does not serve to distinguish available damages from the "normal measure of damages for the commission of a tort": that is, "all damages proximately caused by the injury," whether they be emotional or economic in nature. Schroeder, supra, 87 N.J. at 66, 432 A.2d 834 (citing Berman, supra, 80 N.J. at 432, 404 A.2d 8). "The emotional distress and economic loss resulting [from] this lost opportunity to decide for herself whether or not to terminate the pregnancy constitute plaintiff's damages." Canesi, supra, 158 N.J. at 506, 730 A.2d 805.
The damages for emotional distress awarded in a wrongful birth context are no different from the emotional distress damages awarded without qualification in other medical malpractice contexts that do not involve childbirth. See Evers v. Dollinger, 95 N.J. 399, 410, 471 A.2d 405 (1984) (recognizing a claim for mental and emotional injury arising out of a physician's negligent failure to diagnose breast cancer). As stated there:
Certainly compensable injury in the form of mental pain and suffering in the context of medical malpractice is not new. West v. Underwood, 132 N.J.L. 325, 40 A.2d 610 (E. & A.1945) [permitting recovery for all "pain and suffering, mental and physical" arising from a physician's negligent failure to perform a sterilization]. Damages for [plaintiff's] emotional and mental suffering should be awarded upon proof that this distress resulted from defendant's negligent failure to diagnose her tumor and effectuate prompt and proper treatment. See id. at 326, 40 A.2d 610. "[C]ourts have come to recognize that mental and emotional distress is just as `real' as physical pain, and that its valuation is no more difficult." Berman v. Allan, 80 N.J. 421, 433, 404 A.2d 8 (1979); see Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834 (1981).
[Id. at 410, 471 A.2d 405.]
See also Karol v. Berkow, 254 N.J.Super. 359, 603 A.2d 547 (App.Div.1992). Cf. Strachan v. John F. Kennedy Mem. Hosp., 109 N.J. 523, 534, 538 A.2d 346 (1988) (finding actionable the emotional distress to parents occasioned by viewing their brain dead son over the three day period during which the hospital unreasonably refused their request to remove life support).
As recognized by the Evers Court, such damages are the same as damages for pain and suffering awarded as a matter of course upon proper proofs in tort actions, even in the absence of physical injury. See Ayers v. Jackson Tp., 106 N.J. 557, 576, 525 A.2d 287 (1987)(recognizing equivalence and citing, among others, Evers and Berman); Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 416, 301 A.2d 754 (1973)(affirming compensation for emotional distress from discrimination through an award for pain and suffering); Strachan, supra, 109 N.J. at 537-38, 538 A.2d 346. No logical basis exists for establishing a higher level of proof of emotional distress claimed as damages in a wrongful birth context. That distress is as real and as predictable in this medical malpractice context as it is elsewhere.
Further, no suggestion of a higher standard appears in wrongful birth precedent. Indeed, the current charge on wrongful birth or life, adopted on January 10, 2003, after trial of this matter, does not mandate a higher standard, but instead characterizes such damages as "the emotional injury and anguish that the plaintiffs have suffered and will suffer in the future caused *413 by losing the option to terminate the pregnancy and being compelled to take on the lifetime tasks and burdens of raising a disabled child." Model Civil Jury Charge 5.36F.
In sum, the Court has expanded concepts of duty in order to specifically recognize a tort directed solely against parents, consisting of a deprivation of their right of choice through the absence of genetic counseling, and it has recognized a right of recovery for that tort. Berman, supra, 80 N.J. at 432-33, 404 A.2d 8. Moreover, it has found recoverable the "normal measure of damages" for commission of the tort, including parental damages for emotional distress. Schroeder, supra, 87 N.J. at 66, 432 A.2d 834. It has declared that such parental distress is just as "real" as physical pain, and it has found its valuation to be no more difficult. Berman, supra, 80 N.J. at 433, 404 A.2d 8.
In the context of an award of damages for a tort committed solely against the parents of a genetically impaired offspring, the Court has never found it necessary to require the indicators of reliability imposed in other contexts in which damages for emotional distress have been sought. This result can be explained by three factors: (1) the recognition that tort law should furnish grounds for findings of liability in this context and provide damages for the most likely injuries to have been sustainedemotional distress and extraordinary medical expense; (2) the certainty and predictability of parental emotional distress in the circumstances, and thus the lack of any need to guard against specious claims; and (3) the absence of significant concern for unjustified expansion of liability beyond duty's bounds or the duplication of recovery as the result of the sometimes overlapping claims of parents and their injured children.
The standard thus imposed reflects the Court's consideration of the fundamental purpose of tort law: "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." People Exp. Airlines, Inc. v. Consolidated Rail, 100 N.J. 246, 254-55, 495 A.2d 107 (1985). At the same time, it demonstrates an appropriate degree of concern regarding "the effects of the expansion of liability on the medical profession and society." Carey, supra, 132 N.J. at 58, 622 A.2d 1279 (citing Frame v. Kothari, 115 N.J. 638, 649-50, 560 A.2d 675 (1989)). The balance between these two policy considerations struck by the Court in a wrongful birth/genetic counseling context, and thus the proofs necessary to establish parental emotional distress in this context, necessarily differ from that balance struck in Carey and other cases in which an enhanced standard is applied to parents of injured infants or children. In the latter category of malpractice cases, the Court has limited recovery to distress experienced from witnessing malpractice and its direct effects, thereby excluding that endured as the result of any misfortune accompanying injury to a loved one. The Court has made certain that recovery is accorded only to those foreseeably afflicted, and it has sought to identify and properly compensate only the interests that it has recognized as requiring protection. In a wrongful birth context, these precautions are in large measure unnecessary as the result of the nature of the tort, which is practiced solely on husband and wife, and interferes only with their right to chose to be parents.
On appeal, Weingarten has suggested that because the wrongful birth cases that we have been discussing were decided in a summary judgment context, the availability of damages for emotional distress, but not their measure, was at issue. As a *414 consequence, Weingarten posits, the absence of a discussion of an enhanced standard should not be dispositive of the issue on appeal. It is not. However, we regard that absence, along with the other compelling evidence that we have cited, to demonstrate unequivocally that an enhanced standard does not apply in this case.
As a final matter, we find inapplicable in a wrongful birth context Carey's requirement that, in order for a husband to obtain recovery, he must exhibit "severe" emotional distress, arising from his contemporaneous observation of the malpractice and its effects on the victim, and his shock at the results. Such a requirement cannot be meaningfully applied in the context of inadequate genetic counseling, because the malpractice is, by its nature, unseen and contemporaneously unknown and its effects are not physically manifested, but rather, indirect. Thus, the use of this requirement essentially forecloses recovery to half of the family unit in inadequate genetic counseling cases, despite the recognition of a right to recovery on the part of both parents. Berman, supra, 80 N.J. at 433, 404 A.2d 8. A father's shock and distress, suffered when the "awful truth" of genetic impairment is revealed at birth or thereafter cannot be said to be measurably less severe than that suffered by the mother.
Moreover, Berman and its progeny demonstrate that no basis exists for application of the Carey standard to a father's claim for deprivation of the option to accept or reject a parental relationship with a congenitally impaired child. In this regard, the choice to abort or carry a child to term remains with the mother. Berman, supra, 80 N.J. at 430, 433, 404 A.2d 8. However, the interconnected legal interests of the father, although derivative, have been found to be no less deserving of protection. Id. at 433, 404 A.2d 8; Schroeder, supra, 87 N.J. at 63-64, 432 A.2d 834.
Because the trial court erroneously applied to this case involving a claim by parents of negligent genetic counseling a standard applicable to parental claims of emotional distress arising out of neonatal malpractice, error was committed that requires reversal both of the judgment notwithstanding the verdict entered in favor of Dr. Weingarten with respect to emotional distress damages and the damages verdicts entered against him by the jury.
Upon retrial, plaintiffs may seek to establish damages as the result of past, present and reasonably foreseeable future emotional distress arising from the consequences of inadequate genetic counseling without the necessity of expert testimony. Evers, supra, 95 N.J. at 409-10, 471 A.2d 405. See also J.W. v. L.R., 325 N.J.Super. 543, 547-48, 740 A.2d 146 (App.Div.1999); Devlin v. Johns-Manville Corp., 202 N.J.Super. 556, 563-64, 495 A.2d 495 (Law Div.1985).[6]

IV.
Plaintiffs argue additionally that the trial court erred in instructing the jury that it could assign a measure of fault to plaintiffs as the result of the operation of the doctrine of avoidable consequences and that it erred further by reducing their award of damages for emotional distress by the proportion of fault found by the jury.
In analyzing this argument, we have the advantage of an unchallenged jury verdict in favor of Akawie. Thus, we can safely assume that Akawie fulfilled his duty to counsel plaintiffs with respect to the risk *415 that each was a carrier of the Tay-Sachs gene, the consequence to their unborn child of inheriting the disease, and the availability and necessity of testing to determine whether they were both carriers and whether they had passed on the disease-causing gene to their offspring.
We cannot assume, however, that as the result of Akawie's conduct, plaintiffs fully understood the risks of which they had been informed. If we were to do so, that finding would in large measure obviate the necessity of the further action on Weingarten's part that was established at trial to exist. For purposes of this analysis, we assume that at the conclusion of trial testimony, issues of fact remained as to whether Weingarten had satisfied his independent duty to determine whether Tay-Sachs testing had taken place and, if it had not, to provide additional genetic counseling and to facilitate the necessary tests. Issues of fact also remained as to the extent of plaintiffs' knowledge of the risk to their fetus and of the reason for the lack of testing. It is with that state of facts in mind that we review precedent discussing the doctrine of avoidable consequences.
That doctrine provides that, in instances in which a defendant has committed an actionable wrong, damages flowing from that wrong will be precluded to the extent that they could have been averted by an exercise of reasonable care by the injured party. See, e.g., Lynch v. Scheininger, 162 N.J. 209, 230, 744 A.2d 113 (2000); Ostrowski v. Azzara, 111 N.J. 429, 437, 545 A.2d 148 (1988); Restatement (Second) of Torts § 918.
[The doctrine of avoidable consequences] has its roots in the law of damages.... The doctrine proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he could have avoided.... It has a simple thesis of public policy:
[I]t is not true that the injured person has a duty to act, nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from wasting their resources, both physical or economic. [Restatement (Second) of Torts § 918 at 500, comment a.]
Avoidable consequences, then, normally comes into action when the injured party's carelessness occurs after the defendant's legal wrong has been committed.
[Ostrowski, supra, 111 N.J. at 437-38, 545 A.2d 148.]
The doctrine of avoidable consequences can be distinguished from that of superceding causation. The doctrine of avoidable consequences operates to reduce damages in proportion to the fault of the injured party without extinguishing the liability of the initial tortfeasor. The doctrine of superceding causation permits the initial tortfeasor's liability to be cut off as the result of superceding negligence that is sufficiently unrelated to the initial negligence or so unanticipated that the initial actor is relieved from liability. See generally Lynch, supra, 162 N.J. at 226-29, 744 A.2d 113.
The doctrine of avoidable consequences has been applied in a medical malpractice context as a limitation on the damages recoverable by a plaintiff whose conduct, occurring after the commission of a negligent act by the physician, increases the risk of harm. Thus, in Ostrowski, the Court permitted the jury on retrial to consider plaintiff's continued smoking and poor control of his diabetic condition following *416 allegedly negligent removal of a toenail as conduct that could serve to reduce the damages recoverable as the result of the eventual partial amputation of his leg. Id. 111 N.J. at 446, 545 A.2d 148. See also Lynch, supra, 162 N.J. 209, 744 A.2d 113 (claim for child's disabilities and attendant medical expense could be reduced if the parents were aware at conception of a known but unquantified risk that disability would ensue)[7]; Bryant v. Calantone, 286 N.J.Super. 362, 669 A.2d 286 (App.Div.1996) (finding failure by dental patient to request post-treatment antibiotics that he knew to be necessary as the result of consultations regarding a pre-existing heart murmur, or to consult his cardiologist regarding the lack of necessary medication could reduce the patient's damages); Flynn v. Stearns, 52 N.J.Super. 115, 145 A.2d 33 (App.Div.1958) (analyzing a child's failure to continue stretching exercises recommended by a defendant following his negligent surgical repair of a broken arm as affecting damages, only). In these cases, the doctrine of avoidable consequences was utilized to enable reduction of damages in the proportion that the injured party's own conduct contributed to the total injury sustained.
None of the cases that we have discussed has been premised upon the absence of genetic counseling.[8] In contrast to them, this case is founded solely on a woman's right to determine for herself whether to continue or terminate a pregnancy (Schroeder, supra, 87 N.J. at 66, 432 A.2d 834) and the consequent duties of a physician in this context. "Because the patient's protectable interest is the personal right of self-determination, the doctor's duty of disclosure must be sufficient to enable her to make an informed and meaningful decision concerning whether or not to continue the pregnancy." Canesi, supra, 158 N.J. at 502, 730 A.2d 805. In this regard, a wrongful birth case such as this closely resembles relevant elements of one based upon the doctrine of informed consent, since each is premised upon the patient's right of self-determination. Id. at 503, 730 A.2d 805.
Informed consent doctrine imposes on the physician a duty to disclose "such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available opinions in the form of alternative therapies." Largey v. Rothman, 110 N.J. 204, 208, 540 A.2d 504 (1988). That duty of disclosure rejects the "reasonable physician" standard and focuses on the material risks a "prudent patient" would want to know before making a medical decision.

*417 [Id. at 504, 730 A.2d 805.]
"The foundation for the physician's duty to disclose in the first place is found in the idea that `it is the prerogative of the patient, not the physician, to determine for [her]self the direction in which [her] interests seem to lie.'" Largey v. Rothman, 110 N.J. 204, 214, 540 A.2d 504 (1988) (quoting Canterbury v. Spence, 464 F.2d 772, 781, cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)).[9]
We have strong reservations as to whether the doctrine of avoidable consequences has applicability in any "informed consent" context, and find that it has no application here.[10] The doctrine of informed consent presupposes essential ignorance on the part of the patient with respect to medical issues. The duty to inform arises from that ignorance, and from the patient's need to obtain information sufficient to make the right of self-determination in medical matters meaningful. Even if the patient is partially informed at the onset of the physician-patient relationship, it is the physician's duty to fill any informational gaps that preclude a meaningful exercise of the patient's self-determinative right.[11]
Once a physician-patient relationship is established, no duty on the part of the patient exists to seek out information from a source other than the treating physician.[12]Cf. Conklin v. Hannoch Weisman, 145 N.J. 395, 412, 678 A.2d 1060 (1996) (rejecting the concept of an independent duty of inquiry on the part of a client in an attorney malpractice context). If some information is nonetheless obtained by independent means, it remains the physician's duty to render that information sufficient to provide a basis for the exercise of meaningful choice. In other words, the exercise of choice depends on a foundation of adequate information, and it always remains the physician's responsibility to convey that information, if it is found to be lacking. In this context, the consequences of a physician's failure to inform cannot be meaningfully avoided.[13]
*418 For these reasons, if the evidence on retrial permits such a finding, the jury could determine (1) Weingarten fulfilled his duty, and the failure to obtain prenatal testing was the result of a conscious decision by Geler and Faynin; (2) Weingarten did not fulfill his duty, but Geler and Faynin possessed sufficient knowledge from other sources to permit them to make an informed choice as to whether to terminate the pregnancy, thereby breaking the causal connection between Weingarten's negligence and the outcome; or (3) Weingarten did not fulfill his duty and that failure deprived Geler and Faynin of their right of choice. The jury cannot diminish plaintiffs' damages as the result of its determination that Weingarten partially performed his duty, that Geler and Faynin failed to seek information elsewhere, or that they had some, but not all of the information that they needed. The possibility that they did so requires a reversal of the damages verdict in this case.

V.
As a final matter, we agree with Weingarten's argument on appeal that he is entitled to a new trial on all issues as the result of the misconduct of plaintiff's attorney in his closing argument. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 490-91, 779 A.2d 1078 (2001). Because that argument highlights the presence at the prior trial of troubling and unprofessional conduct that may recur, we address it at length, trusting that our comments will have a needed prophylactic effect on plaintiffs' counsel's future performance.
We commence with the obvious proposition that trials must be conducted fairly and with courtesy toward the parties, witnesses, counsel, and the court.[14] They need not be passionless, for indeed it is the duty of a trial attorney to advocate. Nonetheless, our jurisprudence has long ago set boundaries for advocacy, and unequivocally defined conduct that, by its potential to cause injustice, will not be tolerated. The longstanding nature and clarity of our rules in this regard render their violation of particular concern, since that violation can only reflect adversely on the character and motives of the violator, particularly in instances such as this in which the violations are flagrant, multiple and continuing. There is no harm in seeking to maximize a recovery, even when incidental benefit is thereby achieved. There is enormous harm to the judicial process and to the public's perception of the profession when maximization is attempted unfairly as it was here.
As early as 1910, our courts recognized that in determining damages, jurors were not free to adopt what they would want as compensation for injury, pain and suffering, but were instead required to base their verdict upon what a reasonable person would find to be fair and adequate in the circumstances. Goodrich v. Thomas Cort, Inc., 80 N.J.L. 653, 657, 77 A. 1049 (Sup.Ct.1910). The Old Testament's "golden rule" that you should do unto others as you would wish them to do unto you may not be applied in this context.[15]Botta v. Brunner, 26 N.J. 82, 94, 138 A.2d 713 (1958). See also Cox v. Valley Fair Corp., 83 N.J. 381, 385, 416 A.2d 809 (1980); *419 Henker v. Preybylowski, 216 N.J.Super. 513, 520, 524 A.2d 455 (App.Div.1987).
As stated by the Botta Court:
For hundreds of years, the measure of damages for pain and suffering following in the wake of a personal injury has been "fair and reasonable compensation." This general standard was adopted because of universal acknowledgment that a more specific or definitive one is impossible.... It has never been suggested that a standard of value can be found and applied. The varieties and degrees of pain are almost infinite. Individuals differ greatly in susceptibility to pain and in capacity to withstand it. And the impossibility of recognizing or of isolating fixed levels or plateaus of suffering must be conceded.
* * *
As a consequence, the law has declared the standard for measuring damages for personal injuries to be reasonable compensation and has entrusted the administration of this criterion to the impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.
[Id. 26 N.J. at 92-94, 138 A.2d 713.]
The difficulty that inheres in an invocation of the golden rule in place of the standard articulated in Botta is that it "encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d 1226, 1246 (7th Cir.1982), aff'd on other grounds, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).
In the present case, it is not only that the golden rule was impermissibly invoked, but also the "jolting proximity" (Arnold v. Eastern Air Lines, Inc., 681 F.2d 186, 195 (4th Cir.1982), cert. denied, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983)) of the invocations that cause us grave concern. Throughout his argument on damages, plaintiff's counsel incessantly and impermissibly invited the jury to view the case as though they, not Geler and Faynin, were the parents of the child, and to view that child's afflictions and the distress caused thereby as though they themselves experienced it. We illustrate with but a few of the comments that recurred through page after page of the transcript: "But I want you to think as parents ... what do you think they went through?" "Think as a parent, think what you go through my God, there's something wrong with my child." "Think about as a parent you've just been given the death sentence for your child. What [the child's treating neurologist] Dr. Gold told you about what's going to happen to the child, he told to them." "I want you to think about ... picking up your lifeless child, of picking up your first born, your lifeless child and holding that child to your breast one last time." "And think about going to the cemetery and taking a shovel of dirt ... and being the first person to put dirt on your child's coffin." "[T]hink about what it is to go to the cemetery and visit your child's grave."
With the foregoing in mind, we cannot escape the conclusion that counsel made a calculated determination that any means, however unfair, were justified by the goal of enlarging monetary recovery. See Haid v. Loderstedt, 45 N.J.Super. 547, 553, 133 A.2d 655 (App.Div.1957).
Counsel further infected his closing with arguments addressed to the blighted future economic prospects of plaintiffs' child, although she had no claim for damages: "I mean we have in front of us a gorgeous child, you know, we have our next school teacher, our next nurse, our next contractor. *420 We have our next attorney, we have our next ... realtor, we have our next graduate student. This is what we have." As a result of this argument, the jury could have believed that the child's loss of future employment formed an element of damages recoverable either by her or, indirectly, by her parents. Such was not the case. Procanik, supra, 97 N.J. at 356, 478 A.2d 755.
Moreover, in his closing counsel misstated material elements of the evidence. Counsel claimed, without evidential support, that the Tay-Sachs lab form that Akawie stated he gave to Faynin came in rip-off multiple parts, thereby suggesting that one copy would have remained in the chart if it indeed had been proffered to Faynin on the first December visit. Counsel then misrepresented a post-test lab report for a different test as evidence that the pre-test lab forms given to patients came with carbon copies. To emphasize the lack of any specific entry in the chart that a prescription for the Tay-Sachs test had been written, counsel suggested that chart notations for the first visit on December 11 revealed a prescription for antibiotics, whereas the notation only provided evidence of a plan for treatment at delivery in July. No antibiotics were administered in December.
Of even greater significance, counsel consistently misrepresented Akawie's and Weingarten's testimony regarding their standard office procedures, suggesting that they admitted to deviations through failure to follow up on the Tay-Sachs test on February 18 and March 21, whereas the doctors testified consistently that they would not have offered the test at those points because of the advanced stage of the pregnancy and the unavailability of abortion.[16] Counsel stated as well that Tay-Sachs testing could have been obtained on a rush basis in order to meet any perceived abortion deadline, whereas no foundation for that statement appears in the record.
We have held that the impropriety of such comments to the jury, unsupported by evidence in the record, "is a matter of elementary knowledge to a trial lawyer even of limited experience." Haid, supra, 45 N.J.Super. at 552, 133 A.2d 655. Yet counsel's experience was not limited, but rather, as he stated to the jury and repeatedly to the court, consisted of approximately twenty-five years of practice. Thus, "in the framework of this trial" counsel's misstatement of the evidence had "patient symptoms of a consciously unfair tactic." Ibid.
"Counsel [in his summation to a jury] may `not misstate the evidence nor distort the factual picture.'" Condella v. Cumberland Farms, Inc., 298 N.J.Super. 531, 534, 689 A.2d 872 (1996) (quoting Matthews v. Nelson, 57 N.J.Super. 515, 521, 155 A.2d 111 (App.Div.1959), certif. denied, 31 N.J. 296, 157 A.2d 364 (1960)). Counsel is to be given "broad latitude" in summation but "comment must be restrained within the facts shown or reasonably suggested by the evidence adduced." Condella, supra, 298 N.J.Super. at 534, 689 A.2d 872 (quoting State v. Bogen, 13 N.J. 137, 98 A.2d 295, cert. denied sub nom., Lieberman v. State of New Jersey, 346 U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953)).
[Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 32, 711 A.2d 321 (App.Div.1998).] *421 See also, Colucci v. Oppenheim, 326 N.J.Super. 166, 177, 740 A.2d 1101 (App. Div.1999), certif. denied, 163 N.J. 395, 749 A.2d 369 (2000).
We have likewise held that "[a]n attack by counsel upon a litigant's character or morals, when they are not in issue, is a particularly reprehensible type of impropriety." Paxton v. Misiuk, 54 N.J.Super. 15, 22, 148 A.2d 217 (App.Div.1959). Nor can parties and witnesses be made the target of invective and derogation. Henker, supra, 216 N.J.Super. at 518-19, 524 A.2d 455. Reasoned analysis of the evidence and the credibility of testimony is one thing; wholesale disparagement through an unrestricted deluge of epithets is another. Ibid. See also Tabor v. O'Grady, 59 N.J.Super. 330, 340-41, 157 A.2d 701 (App.Div.1960), mod. on other grounds, 61 N.J.Super. 446, 161 A.2d 267 (App.Div.1960). This is so, because of the tendency of such comments "to instill in the minds of the jury impressions not founded upon the evidence."[17]Botta, supra, 26 N.J. at 98, 138 A.2d 713.
Yet despite our clear precedent, counsel filled his closing argument with derisive and derogatory comments regarding defendants, their counsel, their witnesses and their evidence in general, the cumulative effect of which undoubtedly affected the jury's deliberations. Defendants' case was described as "rotten" and as "garbage"; their arguments, again, as "garbage," as "hogwash," designed "[t]o confuse, to muddle, put up smoke screens." Defendants' testimony was called a "joke," "bunk," "nonsense," and an "outrage." Defense counsel's factual explanation of the difference between the tests performed on men and women was characterized as a "Red Herring," a "smoke screen," designed to throw the jury "off track." Defendant's expert, Bodner was described as "wily and wiggly"; his opinions as "cute," "nonsense," "garbage," "absurd," and "not worth a hill of beans."
Watching Dr. Bodner was like reading the National Enquirer. You look at the headline, you look at the broad headline and it catches your attention. Remember Dr. Bodner, good looking, tall, deep voice, charming ... he tried to pull you in, you know, bond with you. And what happened as you open the page after you look at the headline, you began reading the article.... And then by the end of the article or the end of his testimony he said wait a second I can't believe this, there's nothing here, it's a joke, and that's what I tell you that Dr. Bodner was in this case.
Unfair and prejudicial appeals to emotion through use of charged images were utilized as well. For instance, in describing defendant Akawie's conduct, counsel stated:
[W]hat does he do? He takes away a right that the law gives [Milda Geler] and a right that every woman in this country has had for 30 years. What is that right? to terminate a pregnancy if there's a problem. She had that right. And in this situation [to] terminate a pregnancy where the fetus is affected with the most horrible genetic disease imaginable. You heard about that, and we'll get into that a little bit later. What does Dr. Akawie do on the 21st of March? Buries it. Doesn't even raise it. He might as well have taken one bullet, he might as well [have] written on that bullet three names, Milda Geler
*422 In describing the child's grave, counsel stated:
And I'll bet if you went there now and you got real close to the headstone you'd see a little hand print, a hand print of the mother and a hand print of the father.
When an objection to the comment was made, counsel substituted for it the statement regarding "your child's grave" cited previously as a violation of the golden rule.
"The situation is one that all too frequently arises. A remark is made by counsel, known to him to be improper, and made with intent and expectation that it will improperly influence the jury to the advantage of his client and the disadvantage of the opposing party. No extraneous evidence is needed to establish such intent. If such result is not intended, why are such remarks made? Objection to the remark by opposing counsel enhances the likelihood that the intended effect will be produced, both by attracting attention to it and by invoking a repetition. The remark being made, or made and repeated, the intended effect is probably produced, and the court's mere formal sustaining of the objection to it and telling the jury to disregard what they have already regarded can avail little towards destroying the effect thus probably produced."
[Haid, supra, 45 N.J.Super. at 551, 133 A.2d 655 (quoting Georgeson v. Nielsen, 218 Wis. 180, 260 N.W. 461, 463 (1935)).]
See also, Draper v. Airco, Inc., 580 F.2d 91, 97 (3d Cir.1978) ("we do not expect advocacy to be devoid of passion" but "there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice.")
Further unfair prejudice arose from the following discussion of defendants and their defense:
There arethere are different things that can be done in courts of law. When a doctor is sued he has certain rights, he has certain rights to make any defense he wants. There also is an option to stand before a jury and say we were negligent and that option in this case was not selected. Responsibility for this tragic incident was never accepted. Responsibility for depriving Milda the right to terminate was never accepted. I ask you when you go back into that jury room in response to the questions were the doctors negligent in this case in the care and treatment? I ask you to answer those questions yes.
We have previously found wrongful such insinuations of bad faith on the part of defendants who sought to resolve by trial validly contested claims against them. Henker, supra, 216 N.J.Super. at 518, 524 A.2d 455. "[T]aken together [the comments] represent a deliberate effort by plaintiffs' attorney to have the jurors see themselves as destroyers of evil forces, personified by defendant[s] and [their] attorney[s], that have been depriving his clients of justice." Ibid.
Counsel also engaged repeatedly in the practice of making a knowingly improper comment and, upon objection, impatiently withdrawing it. For instance, on one occasion when an objection was made to counsel's misstatement of the evidence, he responded in open court: "Judge, I'll withdraw it. I mean I don't want to be interrupted, quite frankly." He thereby conveyed to the jury in this comment and in other like circumstances[18] the impression *423 that defendants' attorneys, not he, were at fault. See Haid, supra, 45 N.J.Super. at 554, 133 A.2d 655 ("When a trial attorney consciously engages repeatedly in questions and practices he knows are in violation of rules of evidence and proper court room decorum, which require constant objections on the part of his adversary, the possible disadvantageous effect of such a stream of objections on the mind of [the] lay jury cannot be disregarded."). See also, e.g. Paxton, supra, 54 N.J.Super. at 23, 148 A.2d 217 (withdrawal of a prejudicial remark does not undo the harm); Purpura v. Public Service Elec. & Gas Co., 53 N.J.Super. 475-482, 147 A.2d 591 (App.Div.1959).
We do not suggest by highlighting some of counsel's misconduct that other instances were lacking. For that reason, we trust that our opinion will not be misguidedly used by counsel as evidence to validate conduct, similar in kind, that we did not select as illustrative. The point has been made; its endless iteration can serve no useful purpose.
We recognize that in some cases prompt curative instructions by the trial judge have been found sufficient to ameliorate the effect of isolated lapses on the part of an attorney in closing argument. However, we note in this case that, despite the frequent objections of defense counsel that were in very large measure sustained at side bar, the trial judge gave little guidance to the jury as to what arguments they could accept and what they must ignore.
Courts exist for the judicial determination of the rights of litigants and for the administration of justice, and it is the duty of those presiding, as far as humanly possible, to see that the setting of each individual case shall be such that an impartial and just deliverance shall be had between the parties, and when counsel deliberately seeks to inject into a cause an element which has, and is designed to have, the effect of prejudicing the rights of one or the other of the litigants, it is the duty of the judge to guard against such effect ... by guarding against such pernicious results through proper instruction to the jury....
[Patterson v. Surpless, 107 N.J.L. 305, 308, 151 A. 754 (E. & A.1930).]
See also Paxton, supra, 54 N.J.Super. at 24, 148 A.2d 217 ("The court is bound to make his corrective instructions to the jury so clear, explicit, and emphatic as to efface, if possible, any prejudicial or injurious influence likely to have resulted from the misconduct of counsel").
Here, the necessary instructions were not given, thereby magnifying the corrupting effect of counsel's conduct. We do not suggest that proper instruction could have erased the prejudicial effect of counsel's comments in this case. "It is beyond refute ... that cautionary instructions do not necessarily remove the probability of prejudice." Fineman v. Armstrong, 774 F.Supp. 266, 270 (D.N.J.1991), aff'd 980 F.2d 171 (3d Cir.1992).
[T]he bench and the bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information ... cautionary instructions have little, if any, effect in eliminating the prejudicial harm.
[City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 759 (6th Cir. 1980) (quoting O'Rear v. Fruehauf *424 Corp., 554 F.2d 1304, 1309 (5th Cir. 1977)).]
We merely point to the fact that the absence of curative instructions heightened the already damaging effect of counsel's ill-considered words and increased the likelihood that the jury believed counsel's remarks to have been proper. Purpura, supra, 53 N.J.Super. at 479-81, 147 A.2d 591.
We do not rest our determination of the issue of the necessity of a new trial on any of the individual instances of impropriety that we have cited, or the types of misconduct that we have illustrated, but rather, on our evaluation of the argument of plaintiffs' counsel, as a whole. Draper, supra, 580 F.2d at 97. That evaluation compels our conclusion that we cannot, under the circumstances of this case, safely conclude that the jury's deliberations were free from the corrupting influence of counsel's misconduct, or reliably conclude that their determinations were other than the product of the "mistake, partiality, prejudice and passion" against which we are bound to guard. Kulodzej v. Lehigh Valley Railroad Co., 39 N.J.Super. 268, 274, 120 A.2d 763 (App.Div.1956).
In this regard, we are not required to stay relief in the absence of extraneous evidence that the jury in fact was unfairly influenced by counsel's conduct. Tabor, supra, 59 N.J.Super. at 342, 157 A.2d 701; Haid, supra, 45 N.J.Super. at 551, 133 A.2d 655. We thus draw on the ground of attorney misconduct, as well, to order a retrial on both liability and damages, finding the likelihood of taint in the verdicts on each to be sufficient to warrant that remedy. Diakamopoulos, supra, 312 N.J.Super. at 37, 711 A.2d 321; Petitto v. Sands Hotel & Casino, Inc., 288 N.J.Super. 304, 309, 672 A.2d 253 (App.Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996).
We find none of the other issues raised by the parties to have sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
The verdict against Dr. Michael Weingarten, M.D. and the judgment notwithstanding the verdict on the issue of damages for emotional distress are reversed, and plaintiffs' claims against him are remanded for retrial, in accordance with this opinion, on liability and damages.
NOTES
[1] We have omitted reference to visits after April 24, 1997. Additionally, we focus our opinion on conduct occurring from December 11 to February 18 because of the jury's evident conclusion that this constituted the relevant time period. We base that determination on the fact that the jury found no cause for action based upon Dr. Akawie's failure on March 21 to follow up on the lack of testing.
[2] However, a dispute as to when the entry was written existed.
[3] No formal appeal has been taken from those provisions of the March 15, 2001 order granting judgment in Akawie's favor. Nonetheless, plaintiffs argue in their briefing error in the court's refusal to grant a directed verdict under Rule 4:40-1 against both Akawie and Weingarten at the close of the evidence. We reject that argument. Our review of the record discloses substantial issues of material fact as to whether the defendants had discharged their respective duties that required resolution by the trier of fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995); Caputa v. Antiles, 296 N.J.Super. 123, 133, 686 A.2d 356 (App.Div. 1996), certif. denied, 149 N.J. 143, 693 A.2d 112 (1997).
[4] We have used the term "genetic counseling" as a catch-all for the cases in which the potential for genetic defect was not timely recognized and communicated, either as the result of failure to detect a discoverable fetal defect (Berman), failure to diagnose a sibling's genetic condition (Schroeder), failure to properly interpret maternal test results (Procanik); or advise of the risks of medications (Canesi).
[5] Berman limited parental damages to those resulting from emotional distress. Schroeder and later cases recognized, as well, parental economic loss attributable to their child's affliction.
[6] A claim of permanency might require expert support, since it would involve a fundamental psychological alteration of the emotions, beyond the experience of the average juror.
[7] It is important to note that Lynch was not a wrongful birth case. Although the Lynches had initially asserted causes of action for wrongful birth and wrongful life, they had been dismissed by time of trial, and those dismissals were not challenged on appeal. Lynch v. Scheininger, 314 N.J.Super. 318, 323 n. 4, 714 A.2d 970 (App.Div. 1998). What remained for consideration by the Supreme Court was the child's claim that the failure of Mrs. Lynch's obstetrician to properly manage an earlier pregnancy in which Rh blood factor incompatibility was manifested was a substantial contributing factor to the child's severe disabilities and medical expenses resulting from that form of incompatibility.
[8] As we stated previously, in Lynch, the adequacy of the information regarding the risk of Rh incompatibility that was conveyed by physicians to the Lynches was not directly at issue, since the case was not tried as a wrongful birth/genetic counseling one and since it was clear that independent sources of knowledge of risk existed. For instance, a death certificate for the Lynches' earlier stillborn child listed the cause of death as erythroblastosis fetalis, the condition caused by Rh factor incompatibility, and, subsequent to delivery of that child, the Lynches had consulted with specialists in high-risk pregnancies.
[9] Contrary to plaintiffs' arguments, the trial court did not err in refusing to charge "informed refusal." That doctrine is merely a component of informed consent, and need not have been independently charged here. Howard v. University of Med. and Dentistry of N.J., 172 N.J. 537, 548, 800 A.2d 73 (2002); Matter of Farrell, 108 N.J. 335, 341, 345, 348, 529 A.2d 404 (1987); Matter of Conroy, 98 N.J. 321, 335, 342, 486 A.2d 1209 (1985); Matthies v. Mastromonaco, 310 N.J.Super. 572, 593, 709 A.2d 238 (App.Div.1998), aff'd, 160 N.J. 26, 733 A.2d 456 (1999); Battenfeld v. Gregory, 247 N.J.Super. 538, 551-52, 589 A.2d 1059 (App.Div.1991)
[10] Our research has not disclosed any cases in which the doctrine has been applied in this context. We note that another branch of "wrongful birth" law concerns parents' claims of damages resulting from the birth of a normal child following negligent sterilization or abortion procedures. Our analysis does not pertain to those cases, which raise different issues.
[11] The nature and extent of a patient's independent knowledge is relevant to proximate cause.
[12] If the patient, when entering the relationship, already possesses information sufficient to make an informed choice, then no informational duty on the part of the physician arises. If the patient independently acquires information sufficient to make an informed choice after the inception of the physician-patient relationship, that knowledge may serve to break the causal chain between any negligence on the part of the physician in failing to inform and the ultimate outcome.
[13] Moreover, we see no meaningful way in which damages in this case could be apportioned between the fault of Weingarten and the "fault" of the plaintiffs. The child either had Tay-Sachs disease or it did not. The whole aim of genetic counseling was to determine which was the case. The resulting risk of injury was thus indivisible.
[14] The absence of such courtesy on the part of plaintiffs' counsel leads us to reject his request on appeal for mandatory assignment of a new judge upon retrial on grounds that the prior judge was biased and unfair. Although tested, the demeanor and rulings of that judge exhibited what we regard as remarkable rectitude. The choice of judge for retrial remains within the discretion of the civil presiding judge.
[15] Leviticus 19:2.
[16] It was defendants' position throughout trial that, although abortion remained legal thereafter, the applicable standard of care precluded the procedure after the twenty-fourth week.
[17] The comment of the Botta court occurred in a discussion of the effect of statements by plaintiff's counsel of the damages claimed in an unliquidated damages context. The comment is equally apt here.
[18] On one occasion, counsel drew on his personal experience to refute testimony by an expert, then withdrew the comment upon objection. On another, he stated, before withdrawal, that there "was something rotten about this care and treatment." Counsel was admonished by the court after the first such withdrawal not to do it again. The admonition had no apparent effect.