**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2787-18

MELISSA MIGUT,

     Plaintiff-Respondent,

v.

STATE OF NEW JERSEY,
ADMINISTRATIVE OFFICE OF
THE COURTS,

     Defendant-Appellant,

and

GLENN A. GRANT, J.A.D., in his
capacity as the Acting
Administrative Director of the
Courts, HARVEY M. GOLDSTEIN,
in his capacity as the manager of
the Intensive Supervision Program,
and JASPER REEVES, in his
capacity as building manager,

     Defendants.

_____

Argued March 8, 2021 – Decided August 27, 2021

Before Judges Hoffman, Suter, and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0934-14.

Agnes I. Rymer, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Agnes I. Rymer, on the briefs).

Elizabeth Zuckerman argued the cause for respondent (Mason, Griffin & Pierson, PC, attorneys; Elizabeth Zuckerman, on the brief).

Thaddeus P. Mikulski, Jr., argued the cause for amicus curiae National Employment Lawyers Association of New Jersey.

PER CURIAM

Defendant, State of New Jersey, Administrative Office of the Courts (the AOC), appeals from a jury verdict in favor of plaintiff Melissa Migut, a former employee. In her complaint, plaintiff alleged she sustained injury during a fire drill because of the AOC's failure to accommodate her disability, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. After the jury awarded plaintiff a total of $1,767,531 in compensatory damages, the trial judge entered a final judgment in the amount of $2,495,566, representing damages, counsel fees and interest.

Following our review of the trial record, we are constrained to reverse because we find the combination of a faulty verdict sheet and an improper

closing argument by plaintiff's counsel clearly capable of producing an unjust result. We therefore reverse and remand for a new trial.

I.

In 2002, plaintiff began working for the AOC as a court services officer (CSO) in the Intensive Supervision Program (ISP). The essential duties of that position required fieldwork, including visits to probationers in their homes and workplaces. On May 17, 2010, plaintiff injured her left foot and ankle while playing softball, off-duty. As a result of her injury, plaintiff developed complex regional pain syndrome (CRPS),[1] a condition that rendered her unable to perform the requirements of a CSO. Plaintiff did not return to work as a CSO because she required crutches to move around; in addition, plaintiff needed to wear a CAM boot[2] on her left foot.

---

[1] At trial, Dr. Lee Harris, a neurologist presented by the AOC, explained that CRPS, formerly known as reflex sympathetic dystrophy (RSD), "is an uncommon condition in which an injury instead of going onto healing may lead to chronic pain that is disproportionate to the original injury and can be associated with other symptoms and signs that ultimately lead to chronic pain."

[2] A CAM boot is a "controlled ankle movement" brace that allows a patient with intensive injuries to walk. The boot allows minimal or no movement for the hinge of a person's ankle in order to rest/protect the damaged area until the boot can be removed. See CAM Walker Boots, AliMed (last visited August 23, 2021), https://www.alimed.com/cam-walker-boots/.

A-2787-18

In May 2011, plaintiff applied for Social Security Disability (SSD) insurance but was denied in August 2011. She filed a timely appeal and was denied once again in March 2012.

In the meantime, plaintiff contacted the AOC and expressed her desire to return to work in some capacity. In response, Rhonda Berliner-Gold, the Title I ADA[3] coordinator for the AOC, contacted plaintiff. Berliner-Gold requested that plaintiff provide a doctor's note, which plaintiff submitted. The note said that plaintiff had RSD of the "left foot, ankle" and experienced pain and physical limitations as a result. The note also said that plaintiff "could not walk long distances or stand for long periods of time" and that plaintiff "would be physically unable to defend herself or flee in a dangerous situation."

After receiving the note, Berliner-Gold set up a meeting with plaintiff and Harvey Goldstein, the director of ISP. During the meeting, which took place in 2011, plaintiff's physical limitations were reviewed, and it was explained that she could not return to her position as a CSO.

Following the meeting, Berliner-Gold and Goldstein looked for a suitable, vacant position for plaintiff. Unable to find a vacant position, Goldstein created a primarily sedentary position for plaintiff that involved taking files and entering

---

[3] Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213.

them into a computer.  The position, classified as an Administrative Specialist-2 (AS2) position, paid a lower salary level than what plaintiff previously earned as a CSO.  Plaintiff accepted the position.

In October 2011, plaintiff began her new role as an AS2.  After two days of working, plaintiff requested some additional accommodations.  Specifically, she asked if she could have assistance with retrieving files from the filing cabinet, if she could move her cubicle closer to the restroom, and if she could adjust her work hours to accommodate the doctoral work she was completing at Seton Hall.  Plaintiff further indicated that she would be getting a knee scooter so that she could be more mobile around the office.

Thereafter, a meeting was held with plaintiff, Berliner-Gold, and plaintiff's supervisor, Carolyn Timmons.  In advance of that meeting, plaintiff provided Berliner-Gold with another doctor's note, which again reiterated that plaintiff had been diagnosed with RSD of the left leg, stated that walking "was difficult" for plaintiff, and requested "any accommodation that could be made to reduce the duration or the distance" that plaintiff needed to walk during her work day.

At the meeting, in addition to her earlier requests, plaintiff also requested a handicapped parking spot closer to the building.[4] Although not able to provide plaintiff with a designated handicapped parking spot, the AOC did adjust her hours, which increased the likelihood that she would find an open spot. The AOC also granted her request to move her cubicle closer to the bathroom and next to the filing cabinets. Plaintiff obtained a knee scooter, which made it easier for her to move around the office.

On February 15, 2012, plaintiff told Berliner-Gold that she had no further accommodation requests, and thus, Berliner-Gold was free to "close out" her ADA case file. Berliner-Gold responded that plaintiff should reach out to her if "something changes."

Plaintiff worked without incident until May 10, 2012, when a fire drill was conducted at the building where she worked. At trial, plaintiff testified that she never received any information about how she would evacuate the building

---

[4] Although state law uses the term "handicapped" parking, we note the Division of Disability Services no longer uses the word "handicapped," instead using the word "accessible" to "reflect person-first language." See New Jersey Guide to Accessible Parking, Editor's Note 2 (2019). http://www.state.nj.us/humanservices/dds/documents/BROCHURES/2019/New_Jersey_ Guide_ to_ Accessible_ Parking_ Booklet_ 2019.pdf.

A-2787-18

in the event of an emergency. Moreover, she did not know that fire drills were conducted, as she never participated in a fire drill while employed by the AOC.

Plaintiff's office was on the second floor, so when she heard the alarm, she went to the elevators. Once there, she noticed a sign that said elevators were not to be used in the event of an emergency. As she turned toward the direction of the stairs, she saw Goldstein and asked him if she could use the elevator to exit the building. Goldstein replied that she could not, she had to use the stairs; however, she should take her time. Plaintiff said, "okay" in response. Plaintiff did not have crutches because she used her knee scooter while in the office; however, plaintiff was wearing her CAM boot, which she wore daily.

Plaintiff started down the stairs, unaware that this was not a real emergency, but a fire drill. According to plaintiff, no one offered her assistance and she was unaware of evacuation chairs located in the stairwells. Within the "first couple of steps," plaintiff could feel her foot and ankle pain "intensify." She stopped, turned to Goldstein, who was behind her, told him that her foot was "really hurting," and he should go around her. He told her that it was "okay" and that she should just continue to take her time. Plaintiff testified that by the time she made it down the first landing, her "body [was] in flames" and her "eyes [were] starting to tear up." She was "upset" that she was "holding people up

7

from leaving" the building, so she again told Goldstein to go around her, which he did at that time.

Plaintiff eventually made it out of the building, but was "sobbing" because her "body [was] in a lot of pain." She found a place to sit and rest, but was told by Jasper Reaves, the facilities manager, that she could not remain there. She told Reaves that she was unable to move, so he called for two men to pick her up and move her. Plaintiff rejected this offer, explaining that she "couldn't have anyone touch [her] body" because of the pain she was experiencing; instead, another one of plaintiff's coworkers, Don Bornheimer, helped her by letting her lean on him with her right side. After they moved further away from the building, plaintiff sat back down and remained seated in that spot until it was announced that everyone could reenter the building.

Plaintiff testified that Bornheimer helped her back into the building, and she used the elevator to get back to the second floor. When she returned to her desk, she was crying. One of plaintiff's co-workers, Mary Ann Schellinger, went over to plaintiff and stated that she was a fire marshal. She told plaintiff there are "evacuation chairs[,] but nobody was trained on how to use them." Goldstein also went over to plaintiff and suggested that she go home for the day. Plaintiff called her father to pick her up and left her car in the parking lot. The next day,

plaintiff tried to work a full day in the office, but experienced "a lot of pain," so she again went home early.

Shortly after the fire drill, plaintiff applied for workers' compensation benefits and went out on leave on May 21, 2012. Her application for workers' compensation benefits was approved, and in October 2013, plaintiff received $3,510 in compensation. At the time of trial, plaintiff's workers' compensation permanency claim remained pending a final award.

In June 2013, plaintiff attended a hearing on the denial of her SSD claim. She prevailed on her appeal and in October 2013, she received a lump sum SSD payment in the amount of $42,790, retroactive to May 2010. At that point, plaintiff also began receiving a monthly SSD benefit of $752.

The AOC granted plaintiff extensions of her leaves of absences for approximately two years after the fire drill. Because she was unable to obtain medical clearance to return to work, the AOC discharged her on April 11, 2014. Plaintiff did not appeal or otherwise challenge her discharge. The day after the AOC discharged her, plaintiff applied for State accidental disability retirement benefits, claiming she suffered "traumatic injuries" during the fire drill.

On April 23, 2014, plaintiff filed this action, a one-count complaint alleging that the AOC and other supervisory personnel (collectively defendants)

9

discriminated against her "due to her disability by failing to provide reasonable accommodation in its procedure for and/or implementation of evacuation of disabled employees, in violation of the [LAD]." Two months before trial in 2017, the trial judge granted defendants' motion to dismiss the individual defendants, leaving the AOC as the only remaining defendant.

At trial in November 2017, plaintiff testified that it had been several years since she received any treatment for her CRPS because she had stopped treatment while she was pregnant and breastfeeding.[5] Plaintiff testified that prior to her pregnancy, she usually saw her doctors every "four to six weeks." At the time of trial, she had two appointments scheduled.

One of plaintiff's treating physicians, Dr. Enrique Aradillas Lopez, testified regarding plaintiff's condition. Dr. Lopez, a neurologist, confirmed that plaintiff suffers from CRPS, recounting that he examined plaintiff "around maybe [fifteen, twenty] times," including after the fire drill incident. He testified that prior to that incident, plaintiff was being treated with infusions of ketamine, which were successful; however, after the incident, those treatments

---

[5] Plaintiff married in April 2016 and gave birth to a daughter approximately one year later. She explained, "I stopped treatment for CRPS in the process of getting pregnant. I remained away from any treatment during the course of my pregnancy as well as a year of breast feeding."

were no longer effective. He opined that plaintiff's increase in pain was the result of walking down the stairs during the fire drill; in addition, he stated this increased pain "render[ed] her unable to go back to work."

Several of plaintiff's former co-workers also testified at trial. Timmons testified that she knew that fire drills were conducted but did not advise plaintiff of such. Timmons further testified that she never saw any written procedures for emergency evacuations and never received training on how to use the emergency evacuation chairs or, more generally, on how to help disabled individuals out of the building in case of an emergency.

Goldstein testified that he had never seen one of the emergency evacuation chairs in use and that he had never been trained on how to use them. He was under the impression that it was the responsibility of the fire marshals to ensure that disabled individuals evacuated safely. He further testified that the first time he saw plaintiff during the fire drill was when she was already walking down the stairs, not outside the elevators. He saw her struggling and in pain and asked if she "needed any assistance," but did not offer her one of the evacuation chairs. Goldstein testified that plaintiff told him she did not need any help, and that she could "do it." He asked her if she was "absolutely certain," and she said "yes, if I do it slowly." He then told her to "take the time [she] need[ed]." Shortly after

the fire drill, Goldstein testified that a meeting was held where it was discussed that individuals with physical limitations could have the option of staying behind during a fire drill or other planned evacuation drill.

Reaves, the facilities manager, testified that plaintiff's supervisor, Timmons, should have explained to plaintiff the emergency evacuation procedures. He said that signs near the elevators indicated that they could not be used in the case of an emergency. In addition, he described the evacuation chairs hung on the wall in the ISP area as having a "very bright yellow covering," making them easy to spot. Reaves said that he saw plaintiff during the fire drill, but did not speak with her. When he noticed a backup of people behind her, he exited the building by taking a different staircase; therefore, he did not see her again until he saw her sitting on a curb outside the building. He recounted telling plaintiff she could not stay in that spot and needed to move further from the building. He recalled asking two other people to assist plaintiff. Reaves said that if he knew plaintiff had a problem with taking the stairs, he would have "taken some action," such as making "a recommendation or reviewed the possible alternatives with her supervisor and then the senior manager on the floor at that time."

A-2787-18

Plaintiff also called Schellinger as a witness. Schellinger worked as an Administrative Specialist-4 I in the ISP at the time of the fire drill incident. In addition, she served as assistant fire marshal for the building where she worked with plaintiff. She testified that she did not recall seeing any "emergency evacuation procedures" or disseminating such information to her coworkers. She did remember, however, that she had received training on how to use the evacuation chairs. Schellinger stated she did not see plaintiff exit the building during the fire drill, but she did notice that plaintiff was upset when she returned to her desk after the drill. After speaking with plaintiff, Schellinger wrote an email to her superiors indicating that she (Schellinger) was unaware of "any protocol in place to deal with" an individual having "difficulty exiting the building." Schellinger also indicated that although she knew there were evacuation chairs, she did not know of any persons designated to utilize them.

Berliner-Gold testified that because plaintiff's medical documentation did not say that she could not walk up and down stairs, she did not ask plaintiff if she needed assistance in that regard. She said that "[i]t didn't occur to [her] that [plaintiff] could not get herself out of the building," as she has "plenty of employees who wear boots" and "can go down the stairs just fine." After plaintiff's incident, Berliner-Gold testified that she now specifically asks

employees when they submit medical documentation whether they need assistance with stairs. Also, Berliner-Gold said that the building where plaintiff worked now has a "needs assistance list," so that people who have difficulties with stairs can remain in the stairwell during a fire drill.

The AOC presented testimony from two experts, Dr. Harris, and a vocational expert, Edmond Provder. According to these experts, their review of videos of plaintiff showed that she has greater mobility than she claims. Specifically, as to the videos, they referenced plaintiff's wedding video taken in April 2016, which showed plaintiff walking and dancing without crutches, and a surveillance video, taken two years later in April 2018, which showed plaintiff bypassing a ramp to walk up and down stairs without crutches, and operating a gas pump. Dr. Harris opined that he did not believe that plaintiff could have been injured or could have aggravated her pre-existing CRPS by "simply walking down a few steps, few flights of steps." Additionally, Provder testified that he believed plaintiff could return to work, and that she had the capacity to "earn from $61,200 to $99,700 per year."

During her summation, plaintiff's counsel used a PowerPoint presentation that included imagery that was not shown to defense counsel in advance. After the summation, defendant objected to the following three cartoon images:

- An image of an individual with no legs in a wheelchair, who realizes she cannot use the elevator during an emergency, and says, "Oh no, what now?"

- An image of a "buffoonish character" with his hands in the air under the caption, "What kind of help did Harvey supposedly offer?"

- An image depicting the word "PAIN" surrounded by flames.

Defense counsel also objected to comments of plaintiff's counsel that told the jury that

> it is appropriate for you to try to imagine what it's like, try to put yourself in that situation or imagine a loved one in that situation. And that is a very reasonable way for you to try to assess the amount of emotional distress damages that you believe [plaintiff] is entitled to.

Arguing that plaintiff's counsel "stepped way out of bounds," defense counsel moved for a mistrial. While the judge questioned "the legal precedent for showing cartoons to the jury that aren't in evidence," described the cartoons as going "beyond what I think is fair comment," and noted the "golden rule prohibition" against asking "the jurors to . . . consider them[selves] in the place of the plaintiff," he denied the request of a mistrial. Instead, the judge provided a curative instruction, directing the jury to disregard the cartoons in the PowerPoint as well as the argument suggesting that the jurors put themselves in plaintiff's place.

15

After counsel for the parties delivered their closing arguments, the trial judge charged the jury. Relevant to this appeal, the trial judge provided the jury with the following instruction regarding plaintiff's burden to prove that defendant was aware of her need for reasonable accommodation:

> The third element that the plaintiff must prove is that the defendant was aware of her need for an accommodation. In many cases, plaintiff will do so by offering evidence that she requested an accommodation from defendant. It is not necessary that a request for accommodation be in writing or even use the phrase reasonable accommodation. An employee may use plain English and need not mention any law requiring an accommodation. Although there are no magic words that the employee must use, she must make clear to the employer that she needs some assistance in performing her job because of her disability. However, plaintiff need not prove that she requested an accommodation if she can prove that the defendant knew about her need for an accommodation in some other way.

Notwithstanding this instruction, the judge, over objection,[6] utilized the following language in question one on the verdict sheet to address this issue:

---

[6] Plaintiff asserts that AOC's counsel "did not object to question [one] on the verdict sheet." This contention lacks merit. At the charge conference, the following exchange took place:

THE COURT: [N]ow let's look at the verdict sheet. . . . So based on these rulings then, plaintiff's position is that question one should be what?

A-2787-18

"Has plaintiff proven by a preponderance of the evidence that defendant knew or should have known of her need for an accommodation in the event of a drill?" (emphasis added).

The jury returned a verdict in favor of plaintiff, finding that the AOC failed to accommodate plaintiff's disability during the May 10, 2012 fire drill, in violation of LAD. The jury awarded plaintiff a total of $1,767,531 in compensatory damages, including $200,000 for emotional distress, $300,000 for pain and suffering, $465,421 for back pay, $700,000 for front pay, $65,000 for lost pension benefits, and $37,110 for health care costs. The court dismissed the punitive damages claim, finding that no reasonable jury could justify an award of punitive damages.

---

PLAINTIFF'S COUNSEL: Has plaintiff proven by a preponderance of the evidence the defendant knew or should have known of her need for an accommodation . . . in the event of a fire drill or emergency evacuation . . . .

 . . . .

THE COURT: Has plaintiff [proven by a preponderance of the evidence] the defendant knew or should have known of her need for an accommodation in the event of a fire drill.

AOC'S COUNSEL:  We object to that, Judge.

THE COURT: . . . I understand you have a continuing objection based on the previous rulings . . .

The AOC moved for judgment notwithstanding the verdict or a new trial, arguing that: the workmen's compensation division had exclusive jurisdiction over plaintiff's matter; plaintiff did not carry her burden because she failed to prove that defendant knew she needed an accommodation; and plaintiff's counsel's conduct during trial deprived defendant of a fair trial. Plaintiff opposed the motions and moved for an award of counsel fees, costs, and interest. Following oral argument, the trial judge denied the AOC's motions, and awarded plaintiff counsel fees, costs, and interest.

This appeal followed, with the AOC seeking reversal based on various arguments, including claims of an incorrect jury verdict sheet and an improper closing argument by plaintiff's counsel. Following our review of the trial record, we conclude these two arguments have merit. We address these arguments in turn.

II.

A.

To establish her prima facie LAD case, plaintiff needed to show that the AOC was aware of her need for a reasonable accommodation and knowingly failed to provide that accommodation. The AOC argues the trial judge

18

committed reversible error when he utilized a misleading jury verdict sheet that misstated plaintiff's burden of proof.

"Preliminarily, it is fundamental that the jury charge should set forth in clear understandable language the law that applies to the issues in the case." Toto v. Ensuar, 196 N.J. 134, 144 (2008). An accurate charge is critical because it "is a road map that explains the applicable legal principles, outlines the jury's function, and spells out 'how the jury should apply the legal principles charged to the facts of the case at hand.'" Ibid. (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)).

The judge's charge on the third element was initially accurate, instructing the jury that "the plaintiff must prove . . . that the defendant was aware of her need for an accommodation . . . . [P]laintiff need not prove that she requested an accommodation if she can prove that the defendant knew about her need for an accommodation in some other way." However, over objection, the judge then provided the jury with a verdict sheet that rephrased and effectively lowered plaintiff's burden of proof by asking, "Has plaintiff proven by a preponderance of the evidence that defendant knew or should have known of her need for an accommodation in the event of a drill?" (emphasis added). The AOC argues that the verdict sheet thus misstated an essential element of plaintiff's LAD claim

19

and held her to establishing a negligence standard for a claim that requires intentional conduct. We conclude this claim has merit.

"In construing a jury charge, a reviewing court must consider the charge as a whole to determine whether the charge was correct." Toto, 196 N.J. at 144. "When a party objects at trial, a reviewing court should reverse on the basis of that challenged error unless the error is harmless." Ibid. See also PRESSLER & VERNIERO, RULES GOVERNING THE COURTS OF THE STATE OF NEW JERSEY, cmt. 3.3.2 on R. 2:10-2 (2021 ed.). ("Thus, a charge that fails to focus the jury's attention on the single critical issue constitutes plain error.").

We find there is a very significant difference between "was aware" and "knew or should have known." The latter standard improperly introduces a negligence concept into a failure-to-accommodate claim. Such a standard would arguably require an employer to speculate about a disabled employee's abilities and needs. Indeed, the judge's use of "knew or should have known" in place of "was aware" is inconsistent with an important tenet of disability discrimination law: employers should not presume to know the particular limitations of a disabled employee. The precise limitations should come from the employee and medical advice. As Berliner-Gold explained in her testimony:

> We train all of our managers and supervisors not to assume that an employee cannot do their job because of

some medical issue or condition that they're having. . . . So it's up to the employee to come forward and make known that they have some sort of medical condition [that] is impacting their ability to [do] the job.

Plaintiff presented the AOC with two notes from her doctors regarding her condition. One note stated that plaintiff "could not walk long distances or stand for long periods of time" and the other stated that walking for her "was difficult." The notes contained no information indicating an inability to use stairs. The record also contains no evidence that plaintiff ever raised such an issue during the interactive process. Since plaintiff presented no evidence to support the argument that the AOC "should have known" of her need for an accommodation in the event of a fire drill, we conclude the trial judge erred when he added that phrase to the first question on the jury verdict sheet.

The harmfulness of the error cannot be dismissed as an isolated incident because plaintiff's counsel drew attention to it again during her closing with a power point slide that highlighted the words "knew or should have known." Plaintiff's counsel also argued that there "is a load of evidence in this case that they knew or should have known that Melissa needed an accommodation." We are constrained to conclude the failure to properly inform the jury about plaintiff's burden of proof and the essential elements of her LAD claim resulted in harmful error.

21

B.

The AOC also argues that reversal is warranted because of the inappropriate summation delivered by plaintiff's counsel, which included improper arguments, inflammatory cartoon images, while improperly playing upon the sympathy of the jury. During her summation, plaintiff's counsel referred to the experts who testified for the AOC as "hired guns," in addition to violating the golden rule and depicting the director of ISP as a buffoon with his hands in the air under the caption, "What kind of help did Harvey supposedly offer?" While the trial judge sustained the objections to these improprieties, he denied the request for a mistrial, instead issuing curative instructions. The AOC argues that the cumulative effect of counsel's prejudicial statements and misleading cartoon pictures was to deny the AOC a fair trial, maintaining that the judge's instructions were insufficient to undo the damage that counsel caused. We agree.

Rule 4:49-1(a) requires a new trial if "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Generally, that decision "is entrusted to the sound discretion of the trial court" because the trial court is "in the best position to assess the prejudicial impact of

22

a defect in the proceedings." State v. Harvey, 151 N.J. 117, 205 (1997). However, the "test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951) (emphasis added).

Counsel have "broad latitude" in their closing arguments to a jury. Hayes v. Delamotte, 231 N.J. 373, 382 (2018); Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998). But "[t]hat latitude is not without its limits, and 'counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course of the trial.'" Hayes, 231 N.J. at 387 (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). Accord Bender v. Adelson, 187 N.J. 411, 431 (2006); Biruk v. Wilson, 50 N.J. 253, 260-61 (1967).

Counsel's characterization of the State's experts as "hired guns" improperly questioned their integrity as professionals by implying that they had molded their opinions to fit an agenda rather than the objective facts. See Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 180 (App. Div. 2010) (finding plain error where counsel referred to experts as "hired guns.").

The golden rule is based on the principle that "you should do unto others as you would wish them to do unto you." Geler v. Akawie, 358 N.J. Super. 437,

464 (App. Div. 2003).  It is improper for an attorney to invoke this rule because it tends to encourage "the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence."  Id. at 464-65 (quoting Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1246 (7th Cir. 1982), aff'd on other grounds, 465 U.S. 752 (1984)).  A golden rule argument suggests to jurors that they should "adopt what they would want as compensation for injury, pain and suffering."  Id. at 464.

Counsel's invitation to the jury to place themselves in plaintiff's shoes went well beyond the wide latitude that attorneys are afforded in closing argument.  "[I]n determining damages, jurors were not free to adopt what they would want as compensation for injury, pain and suffering, but were instead required to base their verdict upon what a reasonable person would find to be fair and adequate in the circumstances."  Geler, 358 N.J. Super. at 464.  Counsel's invocation of the "golden rule" was unquestionably improper, as the trial court found.

Finally, the cartoons did not reflect the evidence and were misleading and inflammatory.  The cartoon of a woman in a wheelchair with no legs sitting in front of a closed elevator with smoke bore no resemblance to plaintiff, who has legs and does not rely on a wheelchair.  It also mischaracterized the

circumstances of the events, which unfolded in the context of a fire drill, not an actual fire. It was clearly designed to invoke horror and sympathy.

The cartoon of Goldstein as a buffoon was improper commentary on the disputed issue of whether Goldstein had offered assistance to plaintiff during the fire drill. It is reasonable to conclude that the image would have amplified the flaws in the jury charge because it tended to suggest that Goldstein was a buffoon for not having known what he "should have known" under the circumstances.

Finally, the cartoon of a woman covering her face with her hands under the title: "Compensation For Emotional Damages" was an appeal to sympathy intended to inflate compensation for plaintiff's alleged emotional distress. See also Jones v. Setser, 686 S.E.2d. 623, 631 (W. Va. 2009) (granting a new trial when one error was use of a cartoon in closing that was "an attempt by defense counsel to gain sympathy for . . . [the defendant] while prejudicing the jury against the plaintiff.").

The prejudice was compounded because counsel did not show the cartoons to defense counsel or the court before publishing them to the jury. See Hayes, 231 N.J. at 391 ("Unfair surprise is a proper basis to exclude evidence not properly provided to the opposing party during discovery."); Rodd v. Raritan

Radiologic Assoc., 373 N.J. Super. 154, 169 (App. Div. 2004) (granting a new trial when an image shown to the jury during closing argument did not reflect evidence and was not disclosed in advance to opposing counsel).

"[I]n some cases prompt curative instructions by the trial judge have been found sufficient to ameliorate the effect of isolated lapses on the part of an attorney in closing argument." Geler, 358 N.J. Super. at 470. However, when "the cumulative effect of small errors [is] so great as to work prejudice," courts should not "hesitate[] to afford the party suffering that prejudice relief [when] warranted." Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009). See also Diakamopoulos, 312 N.J. Super. at 37 (explaining that because "a trial is a dynamic organism which can be desensitized by too much error or too much curative instruction," a new trial may be warranted when "there are too many errors [and] the errors relate to relevant matters and in the aggregate rendered the trial unfair"); Hofstrom v. Share, 295 N.J. Super. 186, 193 (App. Div. 1996) (appellate courts often afford relief when counsel insists on making prejudicial and unwarranted appeals to the jury that lead to a tainted verdict).

In isolation, some of the individual errors may have been curable by instructions. However, the cumulative impact of counsel's disparaging comments, invocation of the "golden rule" twice, and the inflammatory cartoon

images during summation, could not be cured.  The instruction to ignore the inflammatory and misleading cartoon images after the jury had already seen them was not sufficient, particularly because they were the last impression of the case.  There are circumstances where the cumulative effect of prejudicial comments by counsel cannot be overcome by a court's curative instruction.  Bender, 187 N.J. at 433.  We are constrained to conclude that this is such a case.

We conclude the cumulative effect of the faulty verdict sheet and the improper closing argument by plaintiff's counsel were "clearly capable of producing an unjust result," R. 2:10-2, and deprived the AOC of a fair trial.  Because these errors could have affected the jury's determination as to liability or damages, or both, a new trial is required.  Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)E.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION